## LYNG, SECRETARY OF AGRICULTURE *v.* CASTILLO ET AL.

No. 85–250.   Argued April 29, 1986—Decided June 27, 1986

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., *post*, p. 643, WHITE, J., *post*, p. 643, and MARSHALL, J., *post*, p. 643, filed dissenting opinions.

*Jeffrey P. Minear* argued the cause *pro hac vice* for appellant.   With him on the brief were *Solicitor General Fried,*

*Assistant Attorney General Willard,* and *Deputy Solicitor General Geller.*

*Maria Norma Martinez* argued the cause for appellees. With her on the brief was *David Hall.** .

JUSTICE STEVENS delivered the opinion of the Court.

Eligibility and benefit levels in the federal food stamp program are determined on a "household" rather than an individual basis. The statutory definition of the term "household," as amended in 1981 and 1982, generally treats parents, children, and siblings who live together as a single household, but does not treat more distant relatives, or groups of unrelated persons who live together, as a single household unless they also customarily purchase food and prepare meals together.[1] Although there are variations in the facts of the four cases that were consolidated in the District Court, they all raise the question whether the statutory distinction between parents, children, and siblings, and all other groups of individuals violates the guarantee of equal treatment in the Due Process Clause of the Fifth Amendment.[2]

---

*Michael R. Lemov* filed a brief for the Food Research and Action Center et al. as *amici curiae* urging affirmance.

[1] Section 3(i) of the Food Stamp Act of 1964, 78 Stat. 703, as redesignated and amended, 7 U. S. C. § 2012(i), provides in part:

"'Household' means (1) an individual who lives alone or who, while living with others, customarily purchases foods and prepares meals for home consumption separate and apart from the others, or (2) a group of individuals who live together and customarily purchase food and prepare meals together for home consumption; *except that parents and children,* **or siblings,** *who live together shall be treated as a group of individuals who customarily purchase and prepare meals together for home consumption even if they do not do so, unless one of the parents,* **or siblings,** is an elderly or disabled member."

The italicized language was added to the definition by § 101(1) of the Omnibus Budget Reconciliation Act of 1981, Pub. L. 97–35, 95 Stat. 358. The clause extending the proviso to siblings, which appears in boldface, was added by the Omnibus Budget Reconciliation Act of 1982, Pub. L. 97–253, 96 Stat. 772.

[2] "The federal sovereign, like the States, must govern impartially. The concept of equal justice under law is served by the Fifth Amendment's

## I

Appellees are families who generally buy their food and prepare their meals as separate economic units; each family will either lose its benefits or have its food stamp allotment decreased as a result of the 1981 and 1982 amendments. Moreover, as appellees' counsel eloquently explained, in each case the loss or reduction of benefits will impose a severe hardship on a needy family, and may be especially harmful to the affected young children for whom an adequate diet is essential.

Appellees accordingly filed these lawsuits to invalidate the 1981 and 1982 amendments and to be treated as separate households for the purpose of determining eligibility and allotment of food stamps. On cross-motions for summary judgment, the District Court considered the merits of appellees' challenge to the constitutionality of the "household" definition.

The District Court was persuaded that the statutory definition had a rational basis. It observed that the amendment made it more difficult for individuals who live together to "manipulate" the rules "so as to obtain separate household status and receive greater benefits"; that the administrative burden of "attempting to make individual household determinations as to 'household' status" was time consuming; and that unrelated persons who live together for reasons of economy or health are more likely "'to actually be separate households'" than related families who live together. App. to Juris. Statement 5a-6a. It held, however, that "a stricter standard of review than the 'rational basis' test" was required. *Id.*, at 7a. Relying primarily on *United States Dept. of Agriculture* v. *Moreno*, 413 U. S. 528, 534 (1973), a

---

guarantee of due process, as well as by the Equal Protection Clause of the Fourteenth Amendment." *Hampton* v. *Mow Sun Wong*, 426 U. S. 88, 100 (1976). Accord, *e. g.*, *United States Dept. of Agriculture* v. *Moreno*, 413 U. S. 528, 533, n. 5 (1973); *Bolling* v. *Sharpe*, 347 U. S. 497, 499 (1954).

case which it construed as holding that a "congressional desire to harm a politically unpopular group" could not justify the exclusion of household groups which contained unrelated persons, the District Court reasoned that "if the Supreme Court is willing to protect unpopular political groups it should even be more willing to protect the traditional family value of living together." App. to Juris. Statement 8a.

We noted probable jurisdiction, 474 U. S. 994 (1985), and now reverse.

## II

The District Court erred in judging the constitutionality of the statutory distinction under "heightened scrutiny." The disadvantaged class is that comprised by parents, children, and siblings. Close relatives are not a "suspect" or "quasi-suspect" class. As a historical matter, they have not been subjected to discrimination; they do not exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group; and they are not a minority or politically powerless. See, e. g., *Massachusetts Board of Retirement* v. *Murgia*, 427 U. S. 307, 313–314 (1976) *(per curiam)*. In fact, quite the contrary is true.

Nor does the statutory classification "directly and substantially" interfere with family living arrangements and thereby burden a fundamental right. *Zablocki* v. *Redhail*, 434 U. S. 374, 386–387, and n. 12 (1978). See *id.*, at 403–404 (STEVENS, J., concurring); *Califano* v. *Jobst*, 434 U. S. 47, 58 (1977). The "household" definition does not order or prevent any group of persons from dining together. Indeed, in the overwhelming majority of cases it probably has no effect at all. It is exceedingly unlikely that close relatives would choose to live apart simply to increase their allotment of food stamps, for the cost of separate housing would almost certainly exceed the incremental value of the additional stamps. See 50 Fed. Reg. 36641, 36642 (1985). Thus, just as in

*United States Dept. of Agriculture* v. *Moreno*—the decision which the District Court read to require "heightened scrutiny"—the "legislative classification must be sustained if the classification itself is rationally related to a legitimate governmental interest." 413 U. S., at 533. See *id.*, at 533–538.[3]

Under the proper standard of review, we agree with the District Court that Congress had a rational basis both for treating parents, children, and siblings who live together as a single "household," and for applying a different standard in determining whether groups of more distant relatives and unrelated persons living together constitute a "household."

---

[3] In *United States Dept. of Agriculture* v. *Moreno*, we held that the definition of the term "household" in the Food Stamp Act as amended in 1971, 84 Stat. 2048, was unconstitutional. That definition drew a distinction between households composed entirely of persons who are related to one another and households containing one or more members who are unrelated to the rest. Unlike the present statute, the 1971 definition completely disqualified all households in the latter category. Not only were all groups of unrelated persons ineligible for benefits, but even groups of related persons would lose their benefits if they admitted one nonrelative to their household. We concluded that this definition did not further the interest in preventing fraud, or any other legitimate purpose of the Food Stamp Program.

"Thus, in practical operation, the 1971 amendment excludes from participation in the food stamp program, *not* those persons who are 'likely to abuse the program' but, rather, *only* those persons who are so desperately in need of aid that they cannot even afford to alter their living arrangements so as to retain their eligibility." 413 U. S., at 538.

The House Committee Report on the Food Stamp Act of 1977 made this reference to the 1971 amendment invalidated in *Moreno:*

"This proviso was essentially an attempt to ban food stamp participation by communal households (so-called 'hippie communes'). In 1973 the Supreme Court in *Moreno* v. *U. S. Department of Agriculture*, 413 U. S. 528, upheld an earlier ruling by a lower court to the effect that this provision was unconstitutional. It had been implemented for only a brief period in a few states." H. R. Rep. No. 95–464, p. 140 (1977).

The 1971 definition was, therefore, "wholly without any rational basis" and "invalid under the Due Process Clause of the Fifth Amendment." 413 U. S., at 538.

As a general matter, the economies of scale that may be realized in group purchase and preparation of food surely justified Congress in providing additional food stamp benefits to households that could not achieve such efficiencies.[4] Moreover, the Legislature's recognition of the potential for mistake and fraud[5] and the cost-ineffectiveness of case-by-case verification of claims that individuals ate as separate house-

---

[4] See S. Rep. No. 97–504, p. 24 (1982) ("Because of economics of scale, small (one-, two-, and three-person) households are provided more food stamps per person than larger households. For example, current benefit levels are $70 for 1-, $128 for 2-, $183 for 3-person households"); S. Rep. No. 97–128, p. 31 (1981) ("It should be noted that because of economics of scale, small (one, two, or three persons) households are provided more food stamps per person than larger households—for example, $70 for one, $128 for two, $183 for three, and $233 for four").

[5] See, e. g., S. Rep. No. 97–504, p. 25 (1982) ("Thus, for larger households that are able to fragment into separate, smaller households simply by purchasing and preparing food separately, or claiming to do so, benefits can be significantly increased. In 1981, Congress took a first step toward limiting this potential manipulation of food stamp rules by *requiring* that parents and children living together apply together, except for elderly or disabled parents. This year's Committee proposal would take the next logical step"); H. R. Rep. No. 97–106, pp. 118–119 (1981) ("Currently, the *program definition of household states, in part, that a household may consist of an individual or group of individuals who, while living with others, customarily purchase food and prepare meals for home consumption separate and apart from others.* This can result in some closely related individuals claiming separate household status for purposes of obtaining food stamp benefits to which they would not otherwise be entitled. For example, an individual over 18 years old, who is living with his parents and has no visible means of support, could be eligible to participate, even though his parents would not be eligible, if the individual were to claim separate household status and indicate that he has zero gross income. The individual could, under existing law, be certified as a separate household, although in fact he was being supported by his parents"); S. Rep. No. 97–128, p. 31 (1981) ("[C]urrent law . . . enables large households to fragment into separate households, result[ing] in increased food stamp benefits"); S. Rep. No. 97–139, pp. 52–53 (1981) ("Under present law, family units may apply as separate households and receive larger benefits if they claim to purchase food and prepare meals separately, even though the children are totally supported by the parents").

holds[6] unquestionably warrants the use of general definitions in this area.[7]

The question that remains is whether Congress could accommodate the wishes of distant relatives and unrelated individuals to dine separately without invidiously discriminating against close relatives.[8] The question, in other words, is whether Congress could "[l]imi[t] the availability of the 'purchase and prepare food separately' rule to those most likely to actually be separate households, although living together

---

[6] "Limiting the availability of the 'purchase and prepare food separately' rule to those most likely to actually be separate households, although living together with others for reasons of economy or health (i. e., unrelated persons and the elderly or disabled), would place a reasonable control on a situation that State and local administrators have identified as one which r[e]quires congressional action. In fact, tightening of the household definition was the leading recommendation for change made in response to a recent survey by the Committee. Suggestions for revision were received from Alaska, Georgia, Louisiana, North Carolina, Oklahoma, South Carolina, Virginia, Washington, Wyoming, and numerous local administrators, including several who testified before the Committee.

"A further problem with the existing household definition occurs when members of a household 'claim' to purchase and prepare food separately, but, in fact, do not. Verification of a household's claim can be difficult and administratively burdensome as noted in the following examples from State administrators." S. Rep. No. 97–504, pp. 24–25 (1982).

[7] See, e. g., Califano v. Jobst, 434 U. S. 47, 53 (1977) ("General rules are essential if a fund of this magnitude is to be administered with a modicum of efficiency, even though such rules inevitably produce seemingly arbitrary consequences in some individual cases"); Dandridge v. Williams, 397 U. S. 471, 485 (1970) ("'The problems of government are practical ones and may justify, if they do not require rough accommodations—illogical, it may be, and unscientific'" (quoting Metropolis Theatre Co. v. Chicago, 228 U. S. 61, 69–70 (1913))). See also, e. g., Mathews v. De Castro, 429 U. S. 181, 189 (1976); Weinberger v. Salfi, 422 U. S. 749, 785 (1975).

[8] Although the origin of the distinction is not entirely clear, the Report of the House Agriculture Committee suggests that its decision not to "expan[d] the single household concept to the entire case load, requiring all individuals living in the same home to be treated as one household," was based on its concern over "the impact of the amendment upon various types of living arrangements." H. R. Rep. No. 97–106, p. 256 (1981).

with others for reasons of economy or health (i. e., [distant relatives and] unrelated persons)." S. Rep. No. 97–504, p. 25 (1982).

So stated, the justification for the statutory classification is obvious. Congress could reasonably determine that close relatives sharing a home—almost by definition—tend to purchase and prepare meals together while distant relatives and unrelated individuals might not be so inclined. In that event, even though close relatives are undoubtedly as honest as other food stamp recipients, the potential for mistaken or misstated claims of separate dining would be greater in the case of close relatives than would be true for those with weaker communal ties, simply because a greater percentage of the former category in fact prepare meals jointly than the comparable percentage in the latter category. The additional fact that close relatives represent by far the largest proportion of food stamp recipients[9] might well have convinced Congress that limited funds would not permit the accommodation given distant relatives and unrelated persons to be stretched to embrace close relatives as well.[10] Finally,

---

[9] Cf. U. S. Dept. of Commerce, Bureau of the Census, Economic Characteristics of Households in the United States: Fourth Quarter 1984, pp. 24, 34 (1986) (statistical table indicating that more than 87% of households receiving food stamps are families related by blood, marriage, or adoption who live and eat together); U. S. Dept. of Commerce, Bureau of the Census, Economic Characteristics of Households in the United States: Third Quarter 1984, pp. 26, 36 (1985) (same); U. S. Dept. of Commerce, Bureau of the Census, Economic Characteristics of Households in the United States: Second Quarter 1984, pp. 26, 36 (1985) (same); U. S. Dept. of Commerce, Bureau of the Census, Economic Characteristics of Households in the United States: First Quarter 1984, pp. 26, 36 (1985) (same).

[10] "[A]n open-ended rule that allows most or all households to fragment simply by changing food purchasing and eating habits is too subject to manipulation." S. Rep. No. 97–504, p. 25 (1982). Even a small percentage of error—given the millions of families involved and the fact that Congress believed that almost all of them could purchase food jointly—could result in the improper expenditure of many millions of dollars. See Budget of the United States Government FY 1985, p. 8–43 (in 1983, ap-

Congress might have reasoned that it would be somewhat easier for close relatives—again, almost by definition—to accommodate their living habits to a federal policy favoring common meal preparation than it would be for more distant relatives or unrelated persons to do so. Because of these differences, we are persuaded that Congress could rationally conclude that the two categories merited differential treatment. Neither the decision to take "one step" in 1981—when the rule was applied to parents and children—nor the decision to take a second step in 1982, when the rule was extended to siblings as well—was irrational because Congress did not simultaneously take a third step that would apply to the entire food stamp program.

The judgment of the District Court is therefore

*Reversed.*

JUSTICE BRENNAN, dissenting.

I would affirm on the ground that the challenged classifications violate the Equal Protection Clause because they fail the rational-basis test.

JUSTICE WHITE, dissenting.

For the reasons given in the last three paragraphs of JUSTICE MARSHALL's dissenting opinion, the classification at issue in this case is irrational. Accordingly, I dissent.

JUSTICE MARSHALL, dissenting.

This case demonstrates yet again the lack of vitality in this Court's recent equal protection jurisprudence. See, *e. g.,* *Cleburne* v. *Cleburne Living Center,* 473 U. S. 432, 455

proximately 21 million participants received food stamp assistance valued at nearly $12 billion); U. S. Dept. of Commerce, Bureau of the Census, Statistical Abstract of the United States 1985, pp. 122–123 (105th ed.) (same). Congress "expect[ed] that eligibility workers could effectively question claims" of " 'separateness' " submitted by distant relatives and unrelated individuals. S. Rep. No. 97–504, p. 26 (1982).

(1985) (MARSHALL, J., concurring in judgment in part and dissenting in part); *San Antonio Independent School Dist. v. Rodriguez*, 411 U. S. 1, 70 (1973) (MARSHALL, J., dissenting). In my view, when analyzing classifications affecting the receipt of governmental benefits, a court must consider "the character of the classification in question, the relative importance to individuals in the class discriminated against of the governmental benefits that they do not receive, and the asserted state interests in support of the classification." *Dandridge* v. *Williams*, 397 U. S. 471, 521 (1970) (MARSHALL, J., dissenting). By contrast, the Court's rigid, bipolar approach, which purports to apply rational-basis scrutiny unless a suspect classification is involved or the exercise of a fundamental right is impeded, see *ante*, at 638–639, puts legislative classifications impinging upon sensitive issues of family structure and survival on the same plane as a refusal to let a merchant hawk his wares on a particular street corner. I do not believe the equal protection component of the Due Process Clause could become such a blunt instrument.

The importance of the interests involved in this case can hardly be denied. The Court concludes that the challenged statute does not directly and substantially interfere with family living arrangements, cf. *Moore* v. *East Cleveland*, 431 U. S. 494 (1977) (plurality opinion), because it "does not order or prevent any group of persons from dining together," *ante*, at 638. The Court relies, apparently, on the fact that the statute does not use criminal sanctions, but merely the loss of benefits, to influence family living decisions. It is a bit late in the day, however, to cut off due process analysis — be it procedural or substantive — by simply invoking such a distinction. See *Goldberg* v. *Kelly*, 397 U. S. 254, 262 (1970); *Shapiro* v. *Thompson*, 394 U. S. 618, 627 (1969).

The food stamp benefits at issue are necessary for the affected families' very survival, and the Federal Government denies that benefit to families who do not, by preparing their

meals together, structure themselves in a manner that the Government believes will minimize unnecessary expenditures. The importance of that benefit belies any suggestion that the Government is not directly and substantially influencing the living arrangements of families whose resources are so low that they must rely on their relatives for shelter. The Government has thus chosen to intrude into the family dining room—a place where I would have thought the right to privacy exists in its strongest form. What possible interest can the Government have in preventing members of a family from dining as they choose? It is simply none of the Government's business.

The challenged classifications amount to a conclusive presumption that related families living under the same roof do all of their cooking together. Thus the regulation does not merely affect the important privacy interest in family living arrangements recognized in *Moore*, but the even more vital interest in survival. As Congress itself recognized, some separate families live in the same house but cannot prepare meals together because of different work schedules. See S. Rep. No. 97–504, p. 25 (1982). Others may lack sufficient plates and utensils to accommodate more than a few persons at once, or may have only one burner on their stove. These extended families simply lack the option of cooking and eating together. For them, the legislative presumption in this case does far greater damage than merely prescribing with whom they must dine. By assuming that they realize economies of scale that they in fact cannot achieve, the regulation threatens their lives and health by denying them the minimal benefits provided to all other families of similar income and needs.

Balanced against these vital interests is Congress' undeniably legitimate desire to prevent fraud and waste in the food stamp program. The legislative presumption that Congress used, however, is related at best tenuously to the achievement of those goals. While I believe that our standard of

review must take into consideration the importance of the individual interests affected, I have some doubt that the classification used here could pass even a rational-basis test. In *United States Dept. of Agriculture* v. *Moreno*, 413 U. S. 528 (1973), we held that a definition of "household" that excluded any living group containing an individual unrelated to any other member of the group did not rationally further the Government's interest in preventing fraud in the food stamp program. Despite the Court's attempts to distinguish this case from *Moreno*, the critical fact in both cases is that the statute drew a distinction that bears no necessary relation to the prevention of fraud. See *id.*, at 535–536 ("denial of essential federal food assistance to *all* otherwise eligible households containing unrelated members" not rationally related to fraud prevention). In the present case, the Government has provided no justification for the conclusion that related individuals living together are more likely to lie about their living arrangements than are unrelated individuals. Nor has it demonstrated that fraudulent conduct by related households is more difficult to detect than similar abuses by unrelated households.

Congress stressed its desire to prevent fraud in the food stamp program, see H. R. Rep. No. 97–687, p. 25 (1982); H. R. Rep. No. 97–106, p. 50 (1981), and it classified the "household consolidation" provision as an antifraud measure. Nevertheless, the Committee Reports cite no hard evidence that related persons living together were in fact significant sources of fraud; the Committees merely determined that the Government could save money by "tighten[ing] the definition of an eligible food stamp household." S. Rep. No. 97–504, at 24. The House did hypothesize, in the course of considering the 1981 amendments, that an 18-year-old child living with his parents could declare himself a separate household for food stamp purposes, H. R. Rep. No. 97–106, at 119. If indeed that abuse widely existed, the resulting legislation, which lumped together all nonelderly parents and their off-

spring living under one roof as a "household," provided a more than sufficient cure. Nevertheless, Congress proceeded to restrict eligibility even further the following year.

When it moved beyond the rule that merely grouped parents and children, and in the 1982 amendments grouped siblings together as well, Congress interfered substantially with the desires of demonstrably separate families to remain separate families. It did so, moreover, while recognizing that distinct families living together often are genuinely separate households, and that the food stamp program should permit separate families that are not related to live together but maintain separate households. S. Rep. No. 97–504, at 25. Congress nevertheless assumed that related families are less likely to be genuinely separate households than are unrelated families, and failed even to provide related families a chance to rebut the legislative presumption. In view of the importance to the affected families of their family life and their very survival, the Court's extreme deference to this untested assumption is simply inappropriate. I respectfully dissent.