Dorothy and Manuel LEDESMA,
Plaintiffs-Appellants,

v.

John BLOCK, Secretary of the United States Department of Agriculture; Dr. John T. Dempsey, Director of Michigan State Department of Social Services; and Paul V. Henrikson, Director of the Michigan State Department of Social Services, Defendants-Appellees.

No. 85–1730.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 5, 1986.
Decided Aug. 6, 1987.

Roy J. Portenga (argued), Libner, Van Leuven & Kortering, Muskegon, Mich., for plaintiffs-appellants.

Jordan Rossen, Richard W. McHugh, Gen. Counsel, Detroit, Mich., for amicus curiae.

William Kanter, Civ. Div., Appellate Staff, U.S. Dept. of Justice, Washington, D.C., James D. Clarke, Stephen H. Garrard, Lansing, Mich., Lee S. Liberman, Justice Dept., Civ. Div., Washington, D.C., Edward R. Cohen (argued), for defendants-appellees.

Before ENGEL and NORRIS, Circuit Judges; COHN,* District Judge.

---

ENGEL, Circuit Judge.

This appeal challenges the constitutionality, on First Amendment and equal protection grounds, of the 1980 and 1981 amendments to the Food Stamp Act of 1977, 7 U.S.C. § 2011, *et seq.* The challenged amendments remove from eligibility for food stamps those persons engaged in labor strikes unless their households had been eligible to receive food stamps before the strike.

## I.

The amendments were enacted in the Food Stamp Act Amendments of 1980, Pub.L. 96–249, § 114, 94 Stat. 357, 361 (1980), and the Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, § 109(a)(1), 95 Stat. 357, 361 (1981). The amendments, as codified in 7 U.S.C. § 2015(d)(3), state:

> Notwithstanding any other provision of law, a household shall not participate in the food stamp program at any time that any member of such household, not exempt from the work registration requirements of paragraph (1) of this subsection, is on strike as defined in section 142(2) of Title 29, because of a labor dispute (other than a lockout) as defined in section 152(9) of Title 29: *Provided,* That a household shall not lose its eligibility to participate in the food stamp program as a result of one of its members going on strike if the household was eligible for food stamps immediately prior to such strike, however, such household shall not receive an increased allotment as the result of a decrease in the income of the striking member or members of the household: *Provided further,* That such ineligibility shall not apply to any household that does not contain a member on strike, if any of its members refuses to accept employment at a plant or site because of a strike or lockout.

Also challenged was the Secretary of Agriculture's implementation of the statute by 7 C.F.R. § 273.1(g)(1):

* Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

Households with striking members shall be ineligible to participate in the Food Stamp Program unless the household was eligible for benefits the day prior to the strike and is otherwise eligible at the time of application. However, such a household shall not receive an increased allotment as a result of a decrease in the income of the striking member(s) of the household.

The purpose of the Food Stamp Act of 1977 is stated in 7 U.S.C. § 2011:

It is declared to be the policy of Congress, in order to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households.... To alleviate such hunger and malnutrition, a food stamp program is herein authorized which will permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation.

Initial efforts to limit food stamps for strikers were the subject of intense debate in the Congress and were defeated both in earlier versions of the food stamp program and in subsequent years. *See* H.Rep. No. 788, 96th Cong., 2d Sess. 131 *reprinted in* 1980 U.S.Code Cong. & Ad.News 843, 964 ("House Report"). The passage of the amendments in 1980 and 1981 reflected a change in congressional thought which was expressed in the legislative history both in terms of fiscal responsibility and in terms of social policy. In a letter of June 12, 1981 addressed to the Honorable Pete V. Domenici, Chairman of the Senate Committee on the Budget, Senator Jesse Helms, Chairman of the Senate Committee on Agriculture, Nutrition, and Forestry, transmitted his committee's recommendations for reducing departmental spending. Helms explained that the recommended changes would achieve overall savings of $130 million in budget authority for fiscal 1981, $3,409 million in budget authority and $3,262 million in outlays for fiscal 1982, and continued increases in reduction of budget authority through fiscal 1984. S.Rep. No. 139, 97th Cong., 1st Sess. 62, *reprinted in* 1981 U.S.Code Cong. & Ad. News, 396, 421–22 ("Senate Report"). The accompanying explanation contained specific references to savings in expenditures for food stamps to be achieved by eliminating households containing strikers unless those households were eligible for food stamps prior to the strike. The Congressional Budget Office estimated the amendments would reduce budget authority and outlays by $50 million each in 1982, by $55 million each in 1983, and by $60 million each in 1984. Careful analysis was also made of the number of persons who had been on strike from time to time during the period preceding the Act and of the number who had applied for and received food stamps. *Id.* at 452–53.

It was plain by examination of the report that the difficult task of allocating scarce resources was foremost in the minds of the Committee's recommendations which accompanied the proposed Act and that social and value judgments would inevitably have to be made as between programs and within the programs themselves. Thus with respect to the elimination of benefits for households of striking workers, the Committee observed:

Households containing strikers would be prohibited from receiving food stamp assistance, unless eligible prior to the strike. If eligible prior to the strike, the household's benefits could not increase as a result of a loss of strike-related income.

Under current law, strikers have frequently made themselves eligible for food stamps through the temporary loss of income during the strike. Households containing striking members are eligible for food stamp assistance if they meet normal income and assets tests, register for work, and are willing to accept job offers from places of employment not subject to a strike. Because the income of a striking household has, obviously, dropped substantially, and because the food stamp program currently looks to a household's income in the upcoming month in judging eligibility, strikers can become eligible almost immediately after

the strike begins. Only in certain cases where the strike has been enjoined do strikers face loss of food stamps. By regulation, jobs offered at a place of employment where the strike has been enjoined under the Taft-Hartley Act or similar railway labor legislation must be accepted by food stamp work registrants (including strikers) in order to retain food stamp eligibility. If the job offer is accepted, the new income is usually enough to preclude eligibility; if it is refused, the result is loss of eligibility.

The current policy of allowing strikers to be eligible for food stamps has damaged the program's public integrity. Granting benefits to strikers can be seen as encouragement to workers to "wait out" management, rather than compromise. In many cases, public employees may receive food stamps even though the strikes in which they are participating are illegal.

\* \* \* \* \* \*

[D]enying benefits (or denying increased benefits) to households containing members on strike is consistent with the underlying policy of tying receipt of food stamps to the ability and willingness to work, as exemplified by provisions requiring work registration, denying benefits to those voluntarily quitting a job without good cause, and allowing the establishment of workfare programs.

*Id.* at 452.

## II.

From February 1 to December 18, 1981 plaintiff Manuel Ledesma was a member of the Teamsters Union and was on strike against his employer, Bil-Mar Foods, Inc. of Borculo, Michigan. His family received food stamps from February 1 until September 30 of that year. The regulation promulgated by the Secretary in conformity to the 1981 amendments was published on September 4, 1981, *see* 41 Fed.Reg. 44,723 (1981), and on October 1, 1981 Ledesma's family stopped receiving stamps. Manuel's wife Dorothy appealed the family's disqualification from the food stamp program to the Michigan Department of Social Servic-

es, which is charged under federal law with responsibility for administering the Act in Michigan. The Department held that the Ledesmas were ineligible for food stamps because Manuel was on strike and there was no evidence that the family had been eligible before the strike.

In an action brought in the United States District Court for the Western District of Michigan, premised upon jurisdiction under 28 U.S.C. § 1331, the Ledesmas in their amended complaint alleged that section 2015(d)(3) and the regulation promulgated thereunder were unconstitutional on essentially three grounds: (1) that the statute violates Manuel Ledesma's First Amendment right to associate with his union by discriminating against strikers; (2) that the statute and regulation violate the Ledesmas' constitutionally protected right to associate with one another; and (3) that they violate the right to equal protection of the laws by creating irrational classifications.

United States District Judge Richard A. Enslen entered an opinion upon the record granting the Secretary of Agriculture's motion to dismiss the complaint under Fed.R. Civ.P. 12(b)(6). Judge Enslen assumed for the purposes of his decision that there is a constitutional right to strike. Nonetheless he held that the plaintiffs had not established that the amendment interfered with that right:

clearly the operative word here is "right," as opposed to the "ability," to strike. It is unquestioned that the government may not penalize an individual for the exercise of constitutional rights.

Neither may it, in general, obstruct an individual from exercising such rights. It is too late in the day to argue, however, that the Constitution compels the government to finance the exercise of those rights.

In so holding Judge Enslen placed particular emphasis on *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), which upheld the federal government's ability to choose not to fund certain abortions even though economically disadvantaged women might thereby be prevented

or deterred from exercising their constitutional right under *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), to terminate a pregnancy. In further support, Judge Enslen quoted *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977):

> There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy. Constitutional concerns are greatest when a State attempts to impose its will by force; the State's power to encourage actions deemed to be in the public interest is necessarily far broader.

*Id.* at 475–76, 97 S.Ct. at 2383 (footnote omitted).

Judge Enslen also rejected plaintiffs' equal protection challenge of disparate statutory treatment of strikers and those who voluntarily quit their employment. Judge Enslen took note that while strikers retained the ability to return to work by terminating the strike, a voluntary quit generally could not unilaterally decide to return to his previous employment and therefore it was not unreasonable that the government would consider one who quit his job no longer to be "voluntarily unemployed" after the passage of ninety days.

### III.

■ The parties disagree on the level of scrutiny required for deciding the constitutionality of the striker amendment. They follow the district court in assuming that there is a constitutional right to strike. The plaintiffs then argue that the amendment penalizes the exercise of the right and therefore is constitutional only if it is necessary to promote a compelling governmental interest. *See, e.g., Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969); *Sherbert v. Verner,* 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963). The government, however, argues that the amendment merely reflects Congress' refusal to subsidize the exercise of the right to strike and that the amendment is constitutional as

long as it is rationally related to a legitimate purpose. *See, e.g., Maher v. Roe, supra; Harris v. McRae,* 448 U.S. 297, 312, 322, 100 S.Ct. 2671, 2685, 2690, 65 L.Ed.2d 784 (1980).

With respect to the question of whether there exists a constitutional right to strike, we believe that such a right has never been clearly recognized by the Supreme Court. Indeed in *United Federation of Postal Clerks v. Blount,* 325 F.Supp. 879 (D.D.C.) *aff'd without opinion,* 404 U.S. 802, 92 S.Ct. 80, 30 L.Ed.2d 38 (1971), the majority of a three-judge district court concluded that workers have no such a right. Concurring Judge John Skelly Wright stated that "the right to strike is, at least, within constitutional concern," 325 F.Supp. at 885, but he concurred on the ground that a constitutional right to strike would not extend to employees of the federal government. While the case was only summarily affirmed by the Supreme Court on a direct appeal, it is established that such summary decisions are binding on the lower courts. *Hicks v. Miranda,* 422 U.S. 332, 344–45, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975); *Whitlow v. Hodges,* 539 F.2d 582, 584 (6th Cir.1976). Therefore, we do not need to assume that the existence of a right to strike dictates heightened scrutiny of the striker amendment.

■ As another ground for applying heightened scrutiny to the striker amendment, plaintiffs argue that the amendment infringes on their right to associate with one another as husband and wife. The Supreme Court has recognized that heightened scrutiny is used in reviewing enactments that " 'directly and substantially' interfere with family living arrangements and thereby burden a fundamental right." *Lyng v. Castillo,* —— U.S. ——, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986) (quoting *Zablocki v. Redhail,* 434 U.S. 374, 387, 98 S.Ct. 673, 681, 54 L.Ed.2d 618 (1978)). This argument by plaintiffs requires two responses. First, it must be rejected insofar as Mrs. Ledesma claims that her right to associate with her husband is abridged because he is on strike. Because his right to strike is not a fundamental right under the

Constitution, and because any violation of her rights in this regard derives from her association with him, any burden on her association with him resulting from his being on strike is not a violation of a fundamental right.

Second, the plaintiffs' argument for applying heightened scrutiny must be examined in light of the fact that Mrs. Ledesma lost her eligibility because she is married to Mr. Ledesma. The Supreme Court addressed the use of the "household" as a unit for determining food stamp eligibility in *Lyng v. Castillo,* — U.S. —, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986). The plaintiffs in *Castillo* were members of families who did not want to be counted as one household, but rather wanted each individual to be able to apply for benefits as a separate household. The district court reviewed the "household" classification under heightened scrutiny and held it was unconstitutional.

The Supreme Court reversed. The Court noted that the household classification disadvantages close relatives and that close relatives "are not a 'suspect' or 'quasi-suspect' class." *Id.* 106 S.Ct. at 2729. Next, the Court stated that the household classification does not "interfere with family living arrangements" because it is "exceedingly unlikely that close relatives would choose to live apart simply to increase their allotment of food stamps." *Id.* 106 S.Ct. at 2729–30. *See also Bowen v. Gilliard,* — U.S. —, 107 S.Ct. 3008, 3017, 97 L.Ed.2d 485 (1987). Thus, the Court held that the household classification is constitutional if it has a rational basis, and the Court went on to conclude that it has a rational basis. *Castillo* disposes of the plaintiffs' contention that because the striker amendment burdens their living together as a family it is subject to strict scrutiny. Because of this, and because there is no constitutional right to strike, we examine the amendment under the rational basis test to see whether plaintiffs' right to equal protection of the laws has been violated.

■ Under the rational basis test, a statutory classification violates the Equal Protection Clause if it "rests on grounds wholly irrelevant to the achievement of [any governmental] objective." *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). Similarly, the Supreme Court has stated:

> In the area of economics and social welfare, [Congress] does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some reasonable basis, it does not offend the constitution simply because the classification is not made with mathematical nicety....

*Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (quotation omitted).

The parties agree that the legislative history of the striker provision, as described above, expresses two legitimate goals—government neutrality in labor disputes and concentrating benefits on people who are unable to work. Plaintiffs argue, however, that in practice the striker provision is not rationally related to these goals.

Regarding the first goal, the plaintiffs claim that the Congress has failed in its efforts at neutrality if indeed that was its objective because the striker provision reflects a preference for management which is not neutralized by any comparable provision depriving management of any governmental benefits during a strike, for example government contracts. *See* House Report at 964. Finally, the UAW International Union urges in its amicus curiae brief that under a neutral policy, the strikers ought to be able to keep their food stamp rights by showing that there is good cause to strike.

These arguments are perhaps good social arguments for those who believe in them, but Congress has the power to make other choices when it allocates social welfare benefits. *Dandridge v. Williams, supra; Bowen v. Gilliard,* 107 S.Ct. at 3015. Moreover, the food stamp provisions do contain certain protections for strikers and the families of strikers. For example, clause two of section 2015(d)(3) preserves food stamp rights for households that were eligible before the beginning of a strike.

Thus to the extent union members are already eligible, the striker provision does not diminish the strength to the union of the threat of striking. In addition, clause three of section 2015(d)(3) provides that a non-striking, unemployed person does not lose food stamp eligibility by refusing a job at a struck plant. These provisions viewed in the context of the rest of the section appear rationally related to a congressional goal of neutrality, and the flaws that plaintiffs point out in the image of neutrality projected by the statute do not in our view negate the overall image to an extent sufficient to justify our intrusion into the legislative process.

■ Regarding the goal of concentrating benefits on people who are unable to work, the union points out in its amicus brief that while a striker's household is denied food stamps, the household of someone who commits fraud in obtaining or using food stamps does not share the punishment of the defrauder. *See* 7 U.S.C. § 2015(b)(1); 7 C.F.R. § 273.16(b). The union argues that this distinction is irrational. The Senate Report stated, "Union strike funds should be responsible for providing support and benefits to strikers during labor-management disputes." Senate Report at 452. Congress' view that union strike funds may exist provides at least one rational basis for distinguishing a striker's family from the family of someone who commits food stamp fraud. Further it is not necessary to upholding a statute on equal protection grounds for Congress to have addressed every conceivable possibility of inequity.

■ The union also argues that the statute is irrational because a striking worker who shows his willingness to work by taking a temporary job is nevertheless ineligible for food stamps. The plaintiffs have not alleged that Mr. Ledesma took a temporary job during the strike. Thus, plaintiffs do not have standing in this case to receive

a decision by us on the validity of this aspect of the amendment. Finally, plaintiffs argue that the distinction between households of strikers and households of those unemployed for reasons other than a strike is irrational, because a striker's family has not made the decision to stop working. This argument ignores the influence of the household's financial situation on a breadwinner's decision whether to work.

■ The same striker provisions involved here were recently held unconstitutional in *International Union, UAW v. Lyng* 648 F.Supp. 1234 (D.D.C.1986) (Oberdorfer, J.), *prob. juris. noted,* —— U.S. ——, 107 S.Ct. 1970, 95 L.Ed.2d 811 (1987). The main difference between that decision and ours is the standard of constitutional review. Judge Oberdorfer observed that the striker amendment requires a striker to either quit his job, return to work, or pressure his union to reach a settlement in order for his family to receive food stamps. Judge Oberdorfer found this choice impermissible, because the first two alternatives "would obviously sever or at least threaten [the striker's] association with his union" and the third alternative "interferes with strikers' right to express themselves about union matters free of coercion by the government." *Id.* at 1239. Similarly, Judge Oberdorfer stated that

> Strikers are a group which, at least as "a historical matter," has "been subject to discrimination," may be defined as a discrete group by "obvious and distinguishing characteristics," and has frequently been in the stance of an unpopular minority.

*Id.* at 1240 (quoting *Lyng v. Castillo*). Because of these characteristics of strikers Judge Oberdorfer distinguished them from the class of close relatives, which *Lyng v. Castillo* found was not a class historically subjected to discrimination.[1]

1. Judge Oberdorfer stated that because of strikers' unpopularity, the case before him was similar to *United States Dept. of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), where the Supreme Court struck down a statute designed in part to prevent "hippies" from receiving food stamps. 648 F.Supp. at

1240. The *Moreno* Court applied the rational basis test and found that the test was not met because denying food stamps to hippies is not a legitimate governmental goal. 413 U.S. at 534–35. (That is also how *Lyng v. Castillo* summarized *Moreno*. *Castillo,* 106 S.Ct. at 2730 n. 3.) Thus, *Moreno* is irrelevant to the question in

Finally, Judge Oberdorfer noted that when a striker exercises his right to associate with his union, "the 'onus' of the striker's exercise of his associational rights falls as heavily on the innocent members of the family as it does on the striker himself." *Id.* at 1240. After explaining that a striker must choose between exercising these various rights, Judge Oberdorfer stated that the amendment is invalid if the purpose of maintaining government neutrality in labor disputes "could be achieved by more narrowly tailored measures" that would not penalize the innocent members of a striker's household. *Id.*

As we explained earlier, the First Amendment right to freedom of association does not include a right to strike. And *Lyng v. Castillo* establishes that the "household" classification does not infringe on the right to associate as a family. Therefore, we reject Judge Oberdorfer's view that the striker provision forces strikers to choose between the exercise of conflicting constitutional rights. Similarly, we reject his approach of requiring Congress to use the most narrowly tailored means to pursue the goals of the striker amendment. The imprecisions in the striker provision that we have discussed were fatal to the amendment under Judge Oberdorfer's analysis, but under our analysis "mathematical nicety" is not required, *Dandridge v. Williams,* 397 U.S. at 485, 90 S.Ct. at 1161, and those same imprecisions are not fatal.

AFFIRMED.

this case of whether the standard of review should be stricter than the rational basis test.