**Melissa J. POIRIER, Plaintiff**

v.

**MASSACHUSETTS DEPARTMENT OF CORRECTION and Kathleen M. Dennehy, individually and in her official capacity as Commissioner of the Massachusetts Department of Corrections, Defendants.**

**Civil Action No. 06–10748–GAO.**

United States District Court, D. Massachusetts.

Jan. 30, 2008.

---

Lori A Jodoin, Rodgers, Powers & Schwartz LLP, Sarah M. Joss, Attorney General's Office, Boston, MA, for Plaintiff.

Kathleen M. Dennehy, Harvey A. Schwartz, Rodgers, Powers & Schwartz LLP, Boston, MA, for Defendants.

### OPINION AND ORDER

GEORGE A. O'TOOLE, District Judge.

The plaintiff, Melissa Poirier, brings this complaint pursuant to 42 U.S.C. § 1983 against the Massachusetts Department of Correction ("DOC") and its Commissioner, Kathleen Dennehy, in both her individual and official capacities. Poirier, who had been employed by the DOC as a correction officer, claims that the defendants violated her constitutional right to maintain a "close, personal association" with a former inmate by terminating her employment because of that relationship pursuant to the DOC's "Rules & Regulations Governing All Employees of the Massachusetts Department of Corrections" ("Rules").

The defendants have moved to dismiss the complaint. For the reasons that follow, their motion is GRANTED and the action is dismissed.

### I. The Plaintiff's Factual Allegations

When ruling on a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, a court must " 'assume the truth of all well-pleaded facts and indulge all reasonable inferences that fit the plaintiff's stated theory of liability.' ... [H]owever, the court need not credit 'bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like.' " Redondo–Borges v. U.S. Dep't of Hous. and Urban Dev., 421 F.3d 1, 5 (1st Cir.2005) (citations omitted). In particular, the court is not required to accept as true legal conclusions within the complaint. See Doran v. Mass. Tpk. Auth., 348 F.3d 315, 318 (1st Cir.2003).

The complaint in this case alleges that Poirier served as a correction officer for the DOC for fifteen years, beginning in 1990, and received "excellent performance evaluations and positive feedback" from her superiors throughout that her service. Throughout the period of her employment, the DOC Rules prohibited employees from "consorting" with "any inmate or former inmate" without permission from specific supervisors. (See Compl. ¶ 9.)

In 2000 and 2001 the DOC investigated allegations that Poirier had maintained an

inappropriate relationship with a current inmate, had delivered contraband to an inmate, and had communicated with a relative of an inmate. After investigation, the DOC sustained the third allegation, but not the first two. The DOC issued her a letter of reprimand, but "it also permitted Ms. Poirier to continue the relationship." (*See id.* ¶ 14.)

In April 2004, the plaintiff notified her superiors that "she would be in social contact with a former inmate, Dennis Novicki," who had been a figure in the prior investigation. The DOC did not tell her to cease association with Novicki. It was the DOC's practice not to reply to notifications such as Poirier's "unless it was to decline permission to associate." (*See id.* ¶¶ 15–16.)

Poirier and Novicki "developed a deep attachment and commitment to one another." (*See id.* ¶ 17.) In July 2004, the plaintiff requested permission from Commissioner Dennehy for Novicki to reside in her home. The DOC thereupon reopened the 2000–2001 investigation and placed Poirier on leave pending the outcome of the investigation. On September 23, 2004, Commissioner Dennehy denied the plaintiff's request for permission to have No-

vicki reside with her. The Commissioner's letter did not order the plaintiff "to cease personal contact with" Novicki. On August 11, 2005, the DOC terminated the plaintiff's employment for having unauthorized contact with Novicki. (*See id.* ¶¶ 18–22.)

## II. Defendants Who May Properly Be Sued

The DOC is a state agency of Massachusetts. A suit against the agency is a suit against the State and is barred by the Eleventh Amendment. *Alabama v. Pugh,* 438 U.S. 781–82, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) ("There can be no doubt, however, that suit against the State and its Board of Corrections is barred by the Eleventh Amendment, unless Alabama has consented to the filing of such a suit.").[1] Thus, the DOC itself must be dismissed as a defendant.

However, the Eleventh Amendment does not bar a suit for prospective injunctive relief against a state official, such as the Commissioner in her official capacity. *Ex parte Young,* 209 U.S. at 155–60, 28 S.Ct. 441; *Redondo–Borges v. U.S. Dep't of Housing and Urban Dev.,* 421 F.3d 1, 7 (1st Cir.2005).[2] Moreover, such suits are

---

1. At the hearing on the present motion, the plaintiff argued that *Whalen v. Massachusetts Trial Court,* 397 F.3d 19 (1st Cir.2005) provided support for permitting a suit directly against the DOC. The plaintiff interpreted *Whalen* as permitting a suit against a named state agency under the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Her interpretation is incorrect. In *Whalen* the court began with the recognition that any suit against the state agency (there the Trial Court of the Commonwealth) would be barred by the Eleventh Amendment and proceeded then to consider whether the relief sought was prospective so as to make viable a suit under *Young. Whalen,* 397 F.3d at 28–29. The opinion did not discuss who would be a proper party defendant in such a case; it apparently, and understandably, as-

sumed the educated reader would realize that a suit under *Young* would be brought against the official rather than the agency. While the opinion may be slightly ambiguous in light of the fact that the original complaint only sought injunctive relief against the state agency, in full context it is apparent that the opinion simply treated the request for injunctive relief as having been presented against a proper *Young* defendant. In any event, there is no reason to read an arguably ambiguous passage in a circuit opinion to be plainly at odds with settled Supreme Court precedent.

2. I take notice that since the commencement of the action, Dennehy has ceased to be Commissioner of the DOC. She has been succeeded by Harold W. Clarke, who is the proper *Ex*

authorized under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Ex parte Young*, 209 U.S. at 159–60, 28 S.Ct. 441)).

Thus, Dennehy remains suable in her personal capacity under § 1983 for damages flowing from any deprivation by her of the plaintiff's rights. As to any potential personal liability, however, there is the question of whether Dennehy is entitled to qualified immunity from suit.

### III. Merits of the Plaintiff's Claim

The plaintiff's claim is that her "right to maintain a close, personal association with Mr. Novicki was protected by both the right of association in the First Amendment to the United States Constitution and the Due Process component of the Fourteenth Amendment to the United States Constitution" (Compl.¶ 23), and that her right in this respect was violated when she was fired "because of her personal relationship with Mr. Novicki." (*Id.* ¶ 27.)

■ "[T]he freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty protected by the Bill of Rights." *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). While the Su-

preme Court has "not attempted to mark the precise boundaries of this type of constitutional protection," it has explicitly accorded such protection to the following private matters, among others:

> marriage, *Zablocki v. Redhail*, 434 U.S. 374, 383–386, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); the begetting and bearing of children, *Carey v. Population Services International*, 431 U.S. 678, 684–686, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); child rearing and education, *Pierce v. Society of Sisters*, 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); and cohabitation with relatives, *Moore v. East Cleveland*, [431 U.S. 494] 503–504 [, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977)].

*Id.* Generally, and in each of the cases cited in the just-quoted summary, in recognizing the constitutionally protected status of such private matters the Court has invoked the guaranty of liberty contained in the Due Process Clause of the Fourteenth Amendment. *See Zablocki*, 434 U.S. at 383–85, 98 S.Ct. 673 (summarizing cases).[3]

The Court has also "recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). "In this respect, freedom of association receives protection as a fundamental element of personal liberty." *Id.* The Court in *Roberts* thus aligned the Fourteenth Amendment's guaranty of personal liberty with the First Amendment's guaranty of associ-

---

*parte Young* defendant for any prospective injunctive relief.

**3.** Even though the plurality opinion in *Zablocki* ultimately relied on the Equal Protection Clause of the Fourteenth Amendment as the basis for invalidating the state statute

there at issue, the justices who joined that opinion recognized that the fundamental right found to be infringed was grounded in the concept of liberty found in the Due Process Clause. *See Zablocki*, 434 U.S. at 383–85, 98 S.Ct. 673.

ational liberty, although it described what has come to be called a "right of intimate association" only in general terms. The Court said:

> Without precisely identifying every consideration that may underlie this type of constitutional protection, we have noted that certain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs.... Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty.

*Id.* at 618–19, 104 S.Ct. 3244. The Court acknowledged that there is

> a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State. Determining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments.... We need not mark the potentially significant points on this terrain with any precision. We note only that factors that may be relevant include size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent.

*Id.* at 620, 104 S.Ct. 3244 (citation omitted).

In sum, the Court has provided three tools for recognizing the existence of a "right of intimate association" in a given case. First, principally in *Roberts* and *Duarte*, the Court has outlined a general definition, articulating in broad terms the key taxonomic criteria to be used. Sec-

ond, by reference to a number of antecedent cases, the Court has identified particular "personal bonds" or "attachments" that it has historically recognized as exemplifying the right. And third, in a series of cases beginning with *Roberts*, it has *rejected* particular claims that the right had been infringed by governmental regulation, finding that the articulated criteria had not been met. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *City of Dallas v. Stanglin*, 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989); *N.Y. State Club Assoc., Inc. v. City of New York*, 487 U.S. 1, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988); *Duarte*, 481 U.S. at 547, 107 S.Ct. 1940; *see Roberts*, 468 U.S. at 621–622, 104 S.Ct. 3244;. The first two tools teach how to identify when the right is to be given recognition, the third by negative implication, teaches how to tell when it should not be.

■ From all this, two broad objective principles appear to emerge. First, recognition of a "right to intimate association" on the facts of a particular case will require consideration of the criteria summarized in *Roberts* and *Duarte:* "size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship." *Duarte*, 481 U.S. at 546, 107 S.Ct. 1940 (citing *Roberts*, 468 U.S. at 620, 104 S.Ct. 3244). Second, whether particular relationships will be classified as falling within the scope of the right will also depend on whether they are those "kinds of personal bonds [that] have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs." *Roberts*, 468 U.S. at 618–19, 104 S.Ct. 3244.

It may be that in future cases the Supreme Court will emphasize the former principle over the latter; some signs of that possibility are seen, for example, in *Lawrence v. Texas*, 539 U.S. 558, 572, 123

S.Ct. 2472, 156 L.Ed.2d 508 (2003) (stating that "[H]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry" (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 857, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (Kennedy, J., concurring))).[4] On the other hand, as noted above, the Court has in other instances repeatedly emphasized that "fundamental" rights are those that are objectively "deeply rooted in this Nation's history and traditions." *Washington v. Glucksberg*, 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (quoting *Moore*, 431 U.S. at 503, 97 S.Ct. 1932). "Our Nation's history, legal traditions, and practices thus provide the crucial 'guideposts for responsible decisionmaking' ... that direct and restrain our exposition of the Due Process Clause." *Id.* at 721, 117 S.Ct. 2258.

Poirier's case fares well under the first principle and less well under the second. Her relationship with Novicki satisfies the *Roberts—Duarte* criteria as to size, selectivity, and exclusivity. The relationship described in the allegations of the complaint, however, is not one of those instances of an "intimate relationship" that are explicitly identified as having already achieved constitutional recognition. *See Duarte*, 481 U.S. at 545, 107 S.Ct. 1940; *Roberts*, 468 U.S. at 619–20, 104 S.Ct. 3244. While it may be assumed that throughout the Nation's history unmarried persons not related by blood have shared living arrangements of various kinds, such an "association" or relationship is not— that is, has never been recognized as being—the kind of "personal bond" that has "played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs."

*Roberts*, 468 U.S. at 618–19, 104 S.Ct. 3244. If the pedigree objectively conferred on an aspect or instance of personal liberty by history and tradition is not required for a right to be classed as "fundamental," it will be hard to say convincingly why some personal associational choices deserve greater constitutional protection than others. Numerosity, selectivity, exclusivity—and even "intimacy" (if that adds anything)—are themselves not so much criteria for separating sheep from goats as for separating some sheep from other sheep. What can give constitutional significance to a particular association that involves only a few select people who have bonded together to exclude others is the fact that the particular association in question is one that has been "so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934), or is "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed." *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937); *see Glucksberg*, 521 U.S. at 720–21, 117 S.Ct. 2302.

■ Applying these principles to Poirier's complaint, the conclusion must be that her right to associate with Novicki as alleged is not a "fundamental" right like the ones identified and described in the guiding cases. Consequently, any interference with that right by the DOC Rules does not have to be justified under "strict scrutiny" by a "compelling state interest." Instead, the DOC Rules can be justified if there is a legitimate and rational basis for them.

■ The DOC Rules pass that test. The DOC obviously has an interest in as-

---

**4.** It may be noted, however, that even in *Lawrence* the Court refrained from labeling the privacy interest there at stake as "funda-mental" in the constitutional sense. *See Cook v. Rumsfeld*, 429 F.Supp.2d 385, 391–96 (D.Mass.2006).

suring the integrity and objectivity of its correction officers in the discharge of their official duties. Prohibiting fraternization with current inmates is a rational means of promoting those legitimate objectives. Although the matter has not been directly addressed by the First Circuit, other circuits have rejected claims that anti-nepotism or anti-fraternization policies generally similar to the DOC's Rules here violated the constitutional rights of public employees. *See, e.g., Montgomery v. Stefaniak,* 410 F.3d 933 (7th Cir.2005); *Akers v. McGinnis,* 352 F.3d 1030 (6th Cir.2003); *Parks v. City of Warner Robins, Ga.,* 43 F.3d 609 (11th Cir.1995); *Parsons v. County of Del Norte,* 728 F.2d 1234 (9th Cir.1984).

Poirier has not argued that the fact that Novicki is a former inmate, rather than a current one, attenuates the DOC's legitimate anti-fraternization interests. Even if she had, such an argument would not be persuasive on the facts alleged in the complaint. As the DOC points out, it is legitimate for it to guard against the possibility that relatively recently released inmates may seek to maintain contacts with inmates who continue to be held in custody and may seek to utilize a friendship with an officer to facilitate those contacts for illicit purposes, such as the introduction of contraband. Some judicial deference is appropriately owed to prison authorities with regard to what measures are reasonably necessary to assure the security of all within the correctional institutions. *See Bell v. Wolfish,* 441 U.S. 520, 548, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Of course, some circumstances could be envisioned where a former inmate might be so far removed from his time in custody that the prospect of compromise of institutional security is remote, but the facts as pled do not make that possibility available to the plaintiff. It appears from the allegations of the complaint that she knew Novicki

when he was an inmate and formed the relationship with him implicating her right to intimate association within a relatively short time after his release. At least on the facts as presented here, it is a legitimate and rational policy to seek to prevent the possibility of a post-incarceration relationship as prophylaxis against the development of a nascent relationship during incarceration. *See Flaskamp v. Dearborn Pub. Sch.,* 385 F.3d 935, 944 (6th Cir.2004) ("[I]n view of the importance of prohibiting teachers and students from beginning romantic relationships, a school board could act prophylactically in this area by prohibiting sexual relationships between teachers and former students within a year or two of graduation.").

The plaintiff relies heavily on the *Zablocki* case in arguing that the DOC Rules directly and substantially interfere with a fundamental right and are therefore subject to strict scrutiny. The circumstances of that case are different in two significant ways from hers.

First, of course, *Zablocki* involved a bar against *marriage,* a species of companionship distinguished from other instances not only by its formal legal status but also by its long (*i.e.,* historical and traditional) acceptance as a fundamental right. *See,* 434 U.S. at 383–84, 98 S.Ct. 673. As discussed above, the plaintiff's "personal relationship" with Novicki short of marriage is entitled to some degree of constitutional protection, but not the heightened degree of protection the Supreme Court has explicitly accorded to marriage.

Second, *Zablocki* involved a state statute declaring certain persons ineligible for marriage to *anyone.* It was a rule imposed by the government as regulator that created a direct impediment to marriage for the affected persons. In contrast, the impediment imposed by the DOC Rules

challenged by the plaintiff is indirect. The Rules impose on a person in the plaintiff's position the unhappy choice of foregoing a desired relationship in order to retain her existing employment, or foregoing the employment in order to enter into the desired relationship, but they do not impose a direct bar against either choice. Depending on which part of the dilemma is given emphasis, the Rules either burden the plaintiff's interest in the relationship or they burden the plaintiff's interest in the employment. Moreover, the Rules are imposed by the government not as regulator, but as employer. In the context of expressive rights guaranteed by the First Amendment, the Court has recognized that the interests of the government as employer may permit somewhat wider latitude in setting rules than is proper for the government as regulator. *See, e.g., Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 1958–59, 164 L.Ed.2d 689 (2006).

In *Zablocki* the Court concluded that the statute had to survive "strict scrutiny" because it directly and substantially interfered with the fundamental right to marry. 434 U.S. at 386–87 n. 12, 98 S.Ct. 673. Not every regulation bearing upon marriage must be subject to strict scrutiny. "To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed." *Id.* at 386, 98 S.Ct. 673.[5] Not only does Poirier's case not implicate a fundamental right, there is also not a "direct and substantial" interference with the personal associational interest that is at stake. Accordingly, even under *Zablocki,* strict scrutiny is not required, and the DOC Rules may be justified if they are rationally related to a

legitimate state purpose. *See Lyng v. Castillo,* 477 U.S. 635, 639, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986). For the reasons set forth above, the Rules pass the "rational-basis" test.

Finally, at the hearing on the motion, the plaintiff raised for the first time an argument that the DOC rules are void for being overbroad. Because the argument was new, both sides were given the opportunity to submit further briefing addressed to that question. Despite having had that opportunity, the plaintiff did not submit any further briefing on the question. Consequently, any such argument is deemed waived.

For all the foregoing reasons, I conclude that the plaintiff's constitutional claim, the sole basis for her § 1983 claim, lacks merit. Judgment should be entered in favor of all defendants on the theory advanced.

## IV. Qualified Immunity

█ One last point needs to be addressed. Even if the foregoing analysis is incorrect and it were to be determined that Poirier has stated a viable claim for relief, it would only be for prospective injunctive relief against the present Commissioner of DOC. It is clear from the discussion above that the right relied on by Poirier had not been "clearly established" as that term is properly understood, *see Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), or that a reasonable person in Dennehy's position would have understood that her enforcement of the anti-fraternization Rules in question would have been a violation of Poirier's constitutional rights. *See Savard*

---

**5.** *See also, Zablocki,* 434 U.S. at 397, 98 S.Ct. 673 ("'[I]t is fair to say that there is a right of marital and familial privacy which places some substantive limits on the regulatory power of government. But the Court has yet to hold that all regulation touching upon marriage implicates a 'fundamental right' triggering the most exacting judicial scrutiny.") (Powell, J., concurring).

*v. Rhode Island,* 338 F.3d 23, 27 (1st Cir. 2003). Accordingly, in these circumstances Dennehy in her personal capacity is entitled to qualified immunity from suit for damages under § 1983.

## V. Conclusion

For the foregoing reasons, the defendants' motion to dismiss is GRANTED in all respects and the complaint is DISMISSED.

It is SO ORDERED.