Michael STEWART, Petitioner,

v.

UNITED STATES of America,
Respondent.

No. 92 Civ. 8464 (VLB).

United States District Court,
S.D. New York.

April 2, 1993.

Michael Stewart, petitioner pro se.

Kerry A. Lawrence, Asst. U.S. Atty.,
White Plains, NY, for U.S.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District
Judge.

### I

Michael Stewart was sentenced on January
30, 1991 to imprisonment for 108 months
based on his conviction of distribution and
possession with intent to distribute crack co-
caine within 1,000 feet of a school on April
30, 1990, and with aiding and abetting these
crimes in violation of 21 USC §§ 812, 841 and
845. Stewart's conviction was affirmed in
*United States v. Stewart, et al.,* 952 F.2d 393
(2d Cir.1991). He has moved to vacate his
sentence. I deny the application.

### II

Stewart's claim that an improper computa-
tion of the quantity of crack involved was
made is disposed of by the Court of Appeals'
summary order at 6, which states that the
"district court ... in adopting the factual
findings of the Probation Department en-
gaged in a sufficiently independent determi-
nation of the quantity of drugs involved."

▮ Stewart also claims that trial counsel
failed to provide effective assistance because
of failure to move for a severance. An appli-
cation for a separate trial would have been
addressed to the trial court's discretion, as
indicated by *United States v. Torres,* 901
F.2d 205, 230 (2d Cir.), *cert. denied* 498 U.S.
906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). I
would not have granted a severance in any
event; consequently the "result of the pro-
ceeding" would not have been affected.
*Strickland v. Washington,* 466 U.S. 668, 687–
88, 693–94, 104 S.Ct. 2052, 2064, 2067–68, 80
L.Ed.2d 674 (1984). Moreover, there is no
basis for assuming that a severance would

have led to a more favorable ultimate outcome.

■ Stewart's attack on the anti-crack statute for vagueness runs counter to widespread acute awareness of the illegality of crack dealing and to recognition of the permissibility of use of such terms as "cocaine base." *United States v. Jackson*, 968 F.2d 158, 161 (2d Cir.), *cert. denied* — U.S. —, 113 S.Ct. 664, 121 L.Ed.2d 589 (1992).

### III

■ Stewart asserts that imposing a more stringent penalty on dealers in crack than on those dealing in other controlled substances creates an invidious distinction which violates equal protection,[1] because, looking at the universe of illegal drug dealing, a higher proportion of African–Americans than of persons of other ethnicities was involved in distribution of crack. On the surface, taken literally and syllogistically, Stewart's argument appears to call for heightened scrutiny of the Congressional choice to impose heavier penalties on crack dealers than on other illegal drug vendors.

But Stewart's argument is delusively superficial. It takes into account only drug dealers of a particular ethnicity and not those persons who may be injured by the drug trade and by criminal activities incident thereto. Drug dealers victimize the communities in which they ply their nefarious trade. As frequently and eloquently pointed out by Percy Sutton when Borough President of Manhattan more than two decades ago, violent crimes are a concomitant of the drug trade; they manifest themselves in efforts by addicts to obtain money to pay for illegal narcotics, and in violent acts committed in the course of warfare between rival drug dealers. A high proportion of the victims of these crimes live in minority areas. Sutton stressed quite cogently, but unfortunately with limited success, that inadequate law enforcement intervention created the risk of denial of equal protection in such areas. Indeed, minority teenagers who refuse to join crack gangs may be subjected to threats and worse.[2]

It would be ironic indeed if efforts to provide equal protection to minority drug dealers resulted in denial of equal protection to innocent minority citizens who, unlike the dealers, have no choice about their involuntary involvement in the drug abuse scenario, and who, unlike criminal defendants vouchsafed the constitutionally critical right to counsel, often have no one to assert their rights in such contexts as this.[3]

Congress examined problems caused by the explosion of the abuse and sale of highly addictive drugs, which occurred beginning in the late 1950s. It sought steps to curtail their harmful consequences. The reasons for the large increase in substance abuse at that time remain crucial but obscure. One possibility was that more rapidly addicting substances more readily available were developed and marketed as a perverse form of technological advance. One approach to this may yet be development of antidrug agents which can neutralize such substances; another may be greater law enforcement efforts against manifestations of criminal behavior which are concomitants of the illegal drug trafficking; a third may be aggressively to compete with the illegal drug traffic for the allegiance of vulnerable youth susceptible to its blandishments.

---

1. An equal protection component is inherent in the Fifth Amendment due process clause. See *United States Dept. of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); see also *Lyng v. Castillo*, 477 U.S. 635, 636 n. 2, 106 S.Ct. 2727, 2728 n. 2, 91 L.Ed.2d 527 (1986); *Hampton v. Mow Sun Wong*, 426 U.S. 88, 103, 96 S.Ct. 1895, 1905, 48 L.Ed.2d 495 (1976); *News Am. Publishing v. FCC*, 844 F.2d 800 (D.C.Cir.1988).

2. See Johnson, *Teenagers Who Won't Join When Drug Dealers Recruit*, N.Y. Times, Jan. 4, 1990, at A1, A20.

3. The category asserted to be adversely affected the disparate impact of enhanced crack penalties is not any ethnic group, but that composed of drug dealers regardless of ethnicity who choose to distribute crack. Thus, no discrete and insular minority is involved here which is inadequately protected by political processes and which thus requires enhanced judicial scrutiny of any disparate impact under broadly phrased constitutional provisions. See *United States v. Carolene Products Co.*, 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938); Powell, *Carolene Products Revisited*, 82 Colum.L.Rev. 1987 (1982).

One of the approaches Congress has chosen up to the present is to impose stricter penalties on more technologically advanced addictive substances—in this instance crack cocaine—which "hook" the victims more rapidly and can be more cheaply distributed on a large scale.[4] Even if Congress' choice were to have a disparate adverse impact on some illegal drug dealers which was otherwise cognizable under equal protection concepts, a legislative body may choose between opposing demands for equality of protection—especially of unequal weight—without violating the constitutional equal protection requirement.[5] Stewart's argument would exalt the right of drug dealers to avoid disparate impact over that of the victims of drug-related crime to equal protection of the laws to reduce their risks of being the objects of murder, robbery, burglary, theft and other crimes.[6]

Stewart's contention was rejected by the Second Circuit in *United States v. Haynes*, 985 F.2d 65 (2d Cir.1993), at 70:

... enhanced penalties for crack reflect a rational and specific congressional aim of deterring drug transactions involving crack. The purpose is obvious—crack cocaine is the most addictive and destructive form of cocaine and because it is also cheaper it is more widely available and has had therefore a corresponding increase in usage.

Congress had the option to make such a judgment, however incomplete as an approach to the overall dilemmas facing it, without violating any constitutional guarantee in doing so.

**SO ORDERED.**

---

**4.** See *Heroin and Heroin Paraphernalia*, Second Report, House Select Committee on Crime, H.Rep. 1080, 91st Cong., 2d Sess. (1971), discussing numerous options including chemical antagonists of addictive substances; Senate Committee on the Judiciary, *Measures Relating to Organized Crime*, Hearings before the Subcommittee on Criminal Laws & Procedures, 91st Cong., 1st Sess. 219–29 (1969).

**5.** See *Miller v. Schoene*, 276 U.S. 272, 279, 48 S.Ct. 246, 247, 72 L.Ed. 568 (1928).

**6.** From this viewpoint, it might be said that Stewart's argument "*is* bosh, but it is very difficult to prove it so in solemn didactic form." Baron Frederick Pollock, letter to Justice Holmes, quoted in 1 *Holmes–Pollock Letters* 182 (Howe ed. 1961) (emphasis in original).