UNITED STATES of America

v.

**Fidel VARGAS, Defendant.**

Nos. 92 Cr. 245 (VLB), 94 Civ. 6867.

United States District Court,
S.D. New York.

Feb. 2, 1995.

Cheryl J. Sturm, West Chester, PA, for petitioner.

Seth C. Farber, Asst. U.S. Atty., New York City, for U.S.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

I

Fidel Vargas, through counsel, moved under 28 U.S.C. § 2255 to vacate his conviction and sentence for conspiracy to distribute approximately two (2) kilograms of cocaine and to do so within 1,000 feet of a public school, in violation of 21 U.S.C. §§ 812, 841 and 856. Vargas appealed his conviction, which was affirmed by summary order. *United States v. Vargas,* Dkt No. 92–1516, 996 F.2d 302 (2d Cir. May 21, 1993).

By memorandum order dated December 14, 1994, I denied the application. *United States v. Vargas,* 871 F.Supp. 623 (S.D.N.Y.). Vargas' counsel has moved for reconsideration of that ruling; reconsideration is granted, and the original decision adhered to for the reasons set forth in the December 14, 1994 memorandum order and the additional ones set forth below.

II

Vargas' counsel first argues that the indictment was inadequate because it did not name a specific single legitimate co-conspirator. No authority requiring naming of co-conspirators in a conspiracy indictment has been cited. So long as existence of one or more co-conspirators is established at trial (whether or not their names are known), and provided that no actual unfair surprise inhibiting defense preparation for trial is established, no infirmity based upon failure to name a co-conspirator exists.

III

Vargas further contends that Sentencing Guidelines applied to the case were promul-

gated "ultra vires" by the Sentencing Commission because of later statutory confirmation of the power to do so. This contention is entirely lacking in merit.

## IV

■ Although the point is not argued in Vargas' motion for reconsideration, the United States Attorney points out that the memorandum order of December 14, 1994 did not explicitly take into account that the informants that Vargas' trial counsel did not interview were not called by either party at trial. Had such informants testified for the prosecution, surprise to Vargas might have been asserted, assuming advance information would have been obtainable by Vargas' counsel and critical to the defense.

Although the informants did not testify, Vargas contends that failure by his counsel to interview the informants amounted to ineffective assistance of counsel. There is no indication, however, that the informants would have been willing to talk with defense counsel other than on the stand if called, or that any knowledge obtainable through interviews with the informants would have assisted the defense. Vargas makes no claim that he failed to advise his counsel concerning relevant facts or that he provided his counsel with any reason to believe that an attempt to interview the informants might have been useful.

A decision to interview governmental informants is not a risk-free choice for defense counsel. The questions put (or not put) to the informants are likely to be reported to the prosecutor, resulting in potential advance disclosure of segments of defense trial strategy which might affect the prosecution's trial preparation.

Strategic decisions of counsel concerning matters of this nature should ordinarily not be second-guessed. There is no basis to conclude either that Vargas' trial counsel acted in an objectively unreasonable manner in choosing not to attempt to interview the informants, or that his doing so would have affected the outcome of the trial.

SO ORDERED.

## APPENDIX

"Reprinted with permission of the Vera Institute of Justice, Inc., © 1994" cite *Federal Sentencing Reporter*, Vol. 7, No. 3, November/December 1994 at pages 128–131.

## FLEXIBLE SENTENCING AND THE VIOLENT CRIME CONTROL ACT OF 1994

### Vincent L. Broderick

Mandatory minimum sentencing, requiring courts to impose harsh prison terms regardless of circumstances, is contrary to the function of the judiciary under Article III of the Constitution. The consequences are far-reaching, including:

● drastic punishment of minor figures in criminal activity not actually deserving of such treatment, while major figures often obtain lighter sentences by cooperating with the prosecution

● use of prison facilities for defendants who do not pose a significant threat to society

● sending rehabilitatable defendants to the equivalent of a school for crime

● placing pressure on defendants to become informants (even if the information given is incorrect), so as to earn a prosecutorial letter exempting them from the mandatory minimum.[1]

Sentencing guidelines, if followed mechanically rather than used for guidance, can have similar evil consequences. Departure from the guidelines is authorized by 18 USC

---

1. See Hon. Lois Forer, *A Rage to Punish: The Unintended Consequences of Mandatory Sentencing* (1994); D. Kopel, *Prison Blues: How America's Foolish Sentencing Policies Endanger Public Safety*, 203 Policy Analysis No. 108 Cato Institute, May 17, 1994. The federal judiciary is virtually unanimous in its opposition to statutorily mandated rigid sentencing, as I pointed out in my testimony on July 28, 1993 before the House Judiciary Committee as Chair of the Criminal Law Committee of the Judicial Conference of the United States, a position I held from October 1990 to October 1993. I told Congress: "I am here to express the complete and unmitigated opposition of the federal judges of this country to mandatory minimums." For further discussion, see Broderick, *The Delusion of Mandatory Sentencing*, 30 Trial # 8 at 62 (August 1994).

§ 3553(b) whenever factors relevant to the case were not "adequately taken into consideration by the Sentencing Commission." Full use of this latitude is crucial to avoid undesirable consequence.

The same latitude may be asserted in connection with mandatory minimum sentences by invoking the Eighth Amendment's ban on "cruel and unusual punishment," and the underlying leeway of the courts to interpret statutes to achieve their objectives.[2] In this connection, the guiding star should be the purposes of sentencing defined in 18 USC § 3553(a).

Mandatory minimum sentencing was tried as an antidote to the drug explosion of the 1960s but was interred by Congress in 1970 when 84 Stat. 1291 repealed former 21 U.S.C. § 174. But the delusive appeal of mandatory minimums as an antidote to crime led to reinstituting and expanding their use since 1984.

## I. TITLE EIGHT OF THE VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT

Title Eight, § 80001 of the Violent Crime Control and Law Enforcement Act of 1994 (18 U.S.C. § 3533(f) constitutes a first step toward eliminating the monumental error of mandatory minimums as an anti-crime weapon. The Title permits courts to sentence "pursuant to guidelines promulgated by the United States Sentencing Commission" without regard to a statutory minimum if five conditions are met.

Each of the criteria presents important questions of interpretation.

1. *The defendant cannot have more than one criminal history point.* The purpose here is to prevent recidivists and career criminals from taking advantage of unwise judicial leniency. In keeping with this objective, courts would have leeway—already exercised under 18 U.S.C. § 3553(b)—to take into account only significant prior offenses in evaluating criminal history, omitting, for example offenses not considered serious under community norms at the time committed. Such minor offenses have already been disregarded in computing points under the guidelines, made applicable under Title Eight.[3] Use of heavy artillery against a minor target makes no sense.

2. *The defendant cannot have used violence or credible threats or possess a firearm or other dangerous weapon (or induce another participant to do so in connection with the offense.* Criterion 2 deals with fact: actual possession of a firearm or of a weapon which is in fact dangerous. In order to bar a defendant from utilizing Title Eight it is not necessary for the weapon to be possessed illegally or to be characterized in some other statute or regulation as dangerous.

The purpose of the provision is evident: to avoid premature release of dangerous criminals. Serious violence, dangerous weapons, or credible threats of violence are easily recognized, and militate against leniency in most instances even apart from statutory strictures. Indeed existing sentencing authority may be insufficient where threats of violence or dangerous weapons are involved in some crimes, especially where monetary amounts or quantities of contraband involved in a crime are given primacy over whether the circumstances indicate likelihood of dangerous or continued criminal activity.

3. *The offense must not have resulted in death or serious bodily injury to any person.* The importance of this prerequisite to relief is emphasized by the name of the "Violent Crime Control and Law Enforcement Act of 1994." Even defendants who do not personally commit violence may be precluded from Title Eight benefits if the crime results in serious bodily injury or death. Like the felony murder rule, this require-

---

2. As in constitutional cases:

"To decide, we turn to the words ... read in their historical setting as revealing the purposes of [the] framers, and search for admissible meanings ... which, *in the circumstances of their application* will effectuate those purposes."

*United States v. Classic,* 313 U.S. 299, 317–18 (1941) (Stone, C.J.) (emphasis added).

3. See *United States v. Stevenson,* 829 F.Supp. 99 (S.D.N.Y.1993); Broderick, *Local Factors in Sentencing,* 5 Fed.Sent.R. 314 (1993).

ment may encourage would-be participants in activities that may lead to violence to have second thoughts.

To be meaningful, however, "offense" must mean an event in which the defendant was actually involved. Frequently, a guilty verdict or plea of guilty will answer the question with little ambiguity. In other instances additional evidence of the actual offense may come to light after conviction. Nothing in Title Eight requires that its prerequisites be evaluated solely based on the content of the indictment or verdict—or be proven beyond a reasonable doubt. If available information indicates dangerousness, a downward departure will doubtless be disfavored by the Sentencing Commission, so that fine-tuned interpretation of the third criterion may be moot.

In some instances, a crime may be broadly defined and peripheral defendants may be named as participants in a large-scale conspiracy. Where a defendant was far removed from evil deeds of the type identified in criterion 3, could not have foreseen their plausibility, and contributed nothing to their occurrence, it may be realistic to treat the "crime" as embracing acts committed, promoted, tolerated or foreseen as plausible by the defendant, but not as extending to the outer limits of the conspiracy or similar count as defined by the indictment, verdict or plea.

If, for example, a defendant knew or had reason to suspect that a participant in a planned robbery, burglary or narcotics transaction was carrying a weapon, and death or serious injury in fact occurred, criterion 3 would bar application of Title Eight. By contrast, if a defendant acting alone sells an illegal product, is not armed and commits no violent act, it would be inappropriate to bar application of Title Eight simply because a kingpin in a cartel defined in the indictment as an integrated conspiracy caused violence at a distant time or place.

**4. _The defendant cannot be an organizer, supervisor of others in the offense or engaged in a continuing criminal enterprise as defined in 28 U.S.C. § 848._** This

provision suggests—contrary to some practices where a letter provided by the prosecution under § 5K1 is the key to avoiding prison—that kingpins should not be given favored treatment even if they turn in underlings. Requirement four of Title Eight bars a supervisor of even a small number of others engaged in crime from benefitting from the Title. The concepts of "organizer" and "supervisor" should be given their ordinary meaning. Whether one is an organizer or supervisor as those terms are construed by an ordinary citizen should control. This construction is buttressed by Congressional use of a term of art ("continuing criminal enterprise") by referring specifically to its technical use in 21 U.S.C. § 848. This contrast should be recognized as indicating a difference in construction, not as surplusage.[4]

In other words, these elements should properly be given a pragmatic rather than technical meaning in keeping with the objective of preventing lenient treatment of serious crime without undue punishment for minor figures. For example, one who organizes only his own activity involving a minor event should not be deemed an "organizer" for purposes of far-reaching consequences.[5]

**5. _The defendant must have "truthfully provided the Government all information and evidence the defendant has concerning the offense or offenses that were a part of the same course of conduct or of a common scheme or plan ..."_** This provision is a "tell all that you can tell" requirement. It is less draconian than the former reliance on letters from the prosecution under § 5K1 as the sole escape from an otherwise mandatory minimum sentence. The United States Attorney must, under Title Eight, have "been afforded the opportunity to make a recommendation," but that recommendation is neither necessary nor binding. Inability to provide useful or new information does not preclude the court from finding compliance with the requirement.

Title Eight's substitution of full disclosure for exclusive reliance on § 5K1 letters reduces the risk that defendants will "give up"

---

**4.** *Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182, 184 n. 1 (D.C.Cir.1986) (R. Ginsburg, J.).

**5.** See *United States v. Caruso*, 814 F.Supp. 382 (S.D.N.Y.1993).

others who may not even be guilty in order to earn a § 5K1 endorsement—or to encourage others to commit crime in order to be able to cooperate by reporting it.

It also signals congressional skepticism of efforts to recruit cooperating defendants to act as informants or be under pressure to manufacture evidence they can utilize to postpone or avoid their own imprisonment.

The penalty for failure to give full disclosure—which necessarily includes truthful disclosure—is denial of the benefits of Title Eight. Full disclosure would appear to include Grand Jury or trial testimony under oath if requested so that the United States may secure the full benefit of the information provided. Prevarication would, of course, be subject to perjury sanctions.[6] It would appear contrary to Title Eight, however, for disclosures given to agents *not* under oath to be the basis for prosecutions for false statements under 18 U.S.C. § 1001 as permitted in some cases under *United States v. Rodgers,* 466 U.S. 475 (1984).

This is so for several reasons: A Title Eight proceeding is a judicial one not "within the jurisdiction" of an Executive Branch agency as required for application of 18 U.S.C. § 1001. Second, use of § 1001 in connection with investigatory activities dilutes the meaning of the oath, because all statements to agents are treated as if an oath had been taken. The effect of using § 1001 in this manner will over time make suspects or even entirely innocent interviewees reluctant to be frank with investigating agents, because anything they say can be used against them. Third, the absence of a transcript makes the fate of the interviewee dependent on the agent's notes or recollection.

Holding § 1001 inapplicable to statements to agents pursuant to Title Eight need not leave the United States vulnerable to abuse of Title Eight by a lying applicant for its benefits. Where the United States Attorney

wishes to insure against fraudulent misuse of Title Eight by a defendant whose statements are suspect, a request for affidavits or Grand Jury testimony serves the salutary function of putting the defendant on notice of the risk of perjury prosecution if lies are forthcoming.

## II. TITLE EIGHT COVERAGE IN CLOSE CASES

In some instances, neither the text of the five Title Eight criteria nor the obvious purpose of the specific criterion involved will guide the court to a reliable conclusion. Here, the overall purpose of Title Eight may be determinative: to avoid undue rigidity in sentencing, while assuring protection of the public from dangerous criminals. In that event, consideration of all relevant circumstances is called for.[7] The views of the Framers of the Constitution, in particular Article III, counsel against narrow interpretations producing unjust results:

> [I]t is not with a view to infractions of the Constitution only, that the independence of the judges may be an essential safeguard ... [against] injury ... by unjust and partial laws. Here also the firmness of the judicial magistracy is of vast importance in mitigating the severity and confining the operation of such laws. *The Federalist* No. 78 (Hamilton).

Under the approach recommended by Hamilton, the objectives of all documents must be consulted in interpreting them.[8] Without his practical approach, we can readily fall prey to what Justice Holmes referred to as "delusive exactness." [9]

The observations made by Hamilton in *The Federalist,* although directed to nonconstitutional adjudication, are equally pertinent to the constitutional concept that under Article III federal judges are not robots, but seek to achieve the objectives of both constitutional and statutory provisions. This requires examination of text in the light of the facts and vice versa. As put by the theologian Paul Tillich in *Love, Power and Justice* ch. 7

---

**6.** See *United States v. Stone,* 429 F.2d 138 (2d Cir.1970).

**7.** *Harris v. Forklift Systems,* 114 S.Ct. 367 (1993).

**8.** For a particularly striking illustration, see *Tedla v. Ellman,* 280 N.Y. 124, 19 N.E.2d 987 (1939).

**9.** Holmes, J. dissenting in *Truax v. Corrigan,* 257 U.S. 312, 342–43 (1921).

(1954): "Every decision which is based on the abstract formulation of justice *alone* is essentially and inescapably unjust" (emphasis added).

In applying Hamilton's approach to interpretation—as in sentencing generally—the effectiveness of all means of achieving the purposes of sentencing set forth in 18 U.S.C. § 3553(a) may be significant. Home confinement with electronic monitoring, for example, particularly if supervised by family or community members who will adopt a concerned stance, use of "boot camp" where appropriate, and other alternatives may be more likely than incarceration in a school for crime to protect the public in some instances.[10]

Stringent interpretation of the five criteria set forth in Title Eight is not necessary to avoid inappropriate leniency toward dangerous criminals. Applicability of Title Eight does not necessarily mean that leniency will be called for by the guidelines or by upward or downward departures under 18 U.S.C. § 3553(b).

## III. AVOIDING CONSTITUTIONAL ISSUES

Departures from mandatory minimum sentences are called for when the Eighth Amendment's prohibition of cruel and unusual punishment, the due process clause of the Fifth Amendment, or other provisions of the Constitution so dictate. Penalties not related to their factual underpinning are contrary to due process.[11]

The Supreme Court has also recognized that the Eighth Amendment is a basic directive of broad scope affecting all aspects of imprisonment.[12] Federal mandatory minimum sentencing is an historically unusual and novel innovation in our Republic. It is

cruel to impose a sentence unrelated to the total situation in a case.[13]

By interpreting the language of Title Eight to achieve its objectives, constitutional issues can be avoided in most if not all cases.

## IV. KEEPING TITLE EIGHT CURRENT .

Instead of referring to mandatory minimum sentences generically, Title Eight lists those covered by its provisions by section number. This may prove troublesome should additional mandatory statutes be enacted without correcting Title Eight, or if the section numbers of existing penalty statutes are changed without corresponding technical corrections. This problem suggests that when the Title Eight is next revisited by Congress, it should be amended to refer to statutes containing mandatory minimum sentences generically rather than by section number.[14]

Should subsequent mandatory minimum sentencing statutes be passed without updating Title Eight, and without any indication that the intent was to make the subsequent statutes more rigid than prior mandatory provisions, proper statutory interpretation would appear to be to apply Title Eight despite the textual deficiency.[15] In such an event, the approach recommended by Alexander Hamilton and the broad objectives of Title Eight would favor applying it, as would the desirability of avoiding constitutional questions where application of a mandatory minimum without adequate review might violate due process or the Eighth Amendment.

## V. APPELLATE REVIEW

Title Eight presents important questions concerning appellate review even though it

10. See *United States v. Neiman*, 828 F.Supp. 254 (S.D.N.Y.1993); *United States v. Martin*, 827 F.Supp. 232 (S.D.N.Y.1993).

11. *Honda Motor Co. v. Oberg*, 114 S.Ct. 1331, 129 L.Ed.2d 336 (1994) (punitive damages must be subject to judicial review as to reasonableness).

12. See *Farmer v. Brennan*, 114 S.Ct. 1970 (1994).

13. See *United States v. Shepherd*, 1994 WL 383155 (D.D.C.1994).

14. See Read, *Is Referential Legislation Worth While?*, 25 Minn.L.Rev. No. 3 at 261 (Fed. 1941); Note, 94 Yale L.J. 1144 (1985); see also Rochvarg, *State Adoption of Federal Law–Legislative Abdication or Reasoned Policymaking?*, 36 Admin.L.Rev. 277 (ABA Summer 1984); New York Constitution Article III § 16.

15. See *United States National Bank of Oregon v. Independent Insurance Agents*, 113 S.Ct. 2173 (1993).

contains no explicit provisions on the subject. It has been widely assumed without textual statutory support that sentencing controversies must be treated as ordinary questions of law, rather than be subject to an abuse of discretion standard. The latter may be more realistic to the extent that sentencing is peculiarly fact-intensive and depends in part on allocution leading to factual findings that would be subject to the plain error rule of Fed.R.Civ.P. 52 in a civil case.

This analysis may apply to the five threshold questions under Title Eight as well as to the sentences imposed insofar as they involve judgments based on witness credibility.

## VI. INFLUENCE OF TITLE EIGHT ON OTHER AREAS OF LAW

In several respects, Title Eight represents a watershed in thinking about criminal justice which may have far-reaching repercussions.

Title Eight reduces the pressure on defendants to plead guilty as the sole path to securing a § 5K1 letter even if a valid defense exists. Going to trial should not necessarily result in enhancement of a sentence for obstruction of justice merely because a court or jury disagrees with a defendant's testimony, nor should it bar departure from an otherwise minimum sentence. The underlying inevitable incentive to plead guilty remains: if the facts are unfavorable, going to trial will make them abundantly clear to the sentencing judge.

In light of Title Eight's downgrading of reliance on coercing suspects to become co-operating defendants, a re-evaluation of the risks as well as benefits of the current level of use of cooperators may be called for. Such activities at times promote as much crime as they detect and stop. Moreover, occasional reliance on dubious investigative methods tends to delay needed review of possible improvements in less questionable techniques.[16]

Title Eight represents a step toward considering all relevant factors in legal decision-making as a means of seeking to achieve statutory objectives to the extent this is practical and does not require excessively complex factfinding.

In exemplifying our ability to take steps toward correcting a crucial mistake, Title Eight may encourage other corrective efforts where a counterproductive policy appears to, but does not, serve an important public interest.

Title Eight may also represent a first step toward eliminating entirely the delusive protection offered by mandatory minimum sentencing, while refocusing attention on far-reaching and meaningful measures to deal with crime. Such refocusing must embrace all aspects of the criminal justice system and factors outside that system which may tend to promote or disfavor criminal activity.

### RECENT DECISIONS BY JUDGE BRODERICK ON SENTENCING

1. *United States v. Gaind,* 829 F.Supp. 669 (S.D.N.Y.1993): downward departure because of partial fulfillment of purposes of sentencing where defendant would be unable to commit further crimes of the only type he was likely to be tempted or able to commit and lost his business and livelihood.

2. *United States v. Lieberman,* 839 F.Supp. 263 (S.D.N.Y.1993): *Gaind* inapplicable and downward departure denied where pharmacist prosecuted for narcotics violation, since loss of pharmacy business would not necessarily preclude recurrence of criminal activity.

3. *United States v. Stevenson,* 829 F.Supp. 99 (S.D.N.Y.1993): reduction in criminal history granted by eliminating points for conviction involving minor amount of marijuana secured for defendant's own use.

4. *United States v. Neiman,* 828 F.Supp. 254 (S.D.N.Y.1993): downward departure granted based upon likelihood of rehabilitation in non-narcotics context where religious leaders and family members agreed to supervise home confinement and medical treatment was to be provided.

---

**16.** See *Measures Relating to Organized Crime,* Hearings before the Subcommittee on Criminal Laws & Procedures, Senate Judiciary Committee, 91st Cong., 1st Sess. 219–29 (1969).

5. *United States v. Martin,* 827 F.Supp. 232 (SDNY 1993): downward departure based upon voluntary participation in shock incarceration ("boot camp") program.

6. *United States v. Caruso,* 814 F.Supp. 382 (SDNY 1993): downward departure where candy store operator was sole actor in local gambling activity grossing $20,000 annually.

7. *Stewart v. United States,* 817 F.Supp. 12 (S.D.N.Y.1993): rejected drug dealer argument that enhanced sentencing for crack violated equal protection because of disparity in race of such dealers, because participation in drug dealing is voluntary, whereas impact on victims of drug crime in same communities was the more appropriate concern in interpreting equal protection clause.

8. *Shendur v. United States,* 1995 WL 39493, 1995 U.S.Dist. LEXIS 1300, 874 F.Supp. 85 (S.D.N.Y.1995): discusses the interpretation of Title Eight.