06-4111-cv
Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of N.Y.

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2006

(Argued: June 15, 2007                    Decided: September 13, 2007)

Docket No. 06-4111-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

CHI IOTA COLONY OF ALPHA EPSILON PI FRATERNITY, ALEX KHAYCHUK, KONSTANTIN NOVODORSKY, VITALY USHERENKO, GENNADY AKSELRUD, ALEKSANDER BARANOV, DAVID BOROWIK, ROMAN BURTMAN, DANNY KANE, MIKE LANTINO, JOSH MALEK, DANNY MARKOWITZ, EVAN MCKIERNAN, RYAN RICHMOND, BILLY RUPPERT, BRIAN THOMSON, JONATHAN TORRES, STEVE VERBITSKY, *and* MOSHE ZEITOUNI,

    *Plaintiff-Appellees*,

    -v.-

CITY UNIVERSITY OF NEW YORK, MARLENE SPRINGER, CAROL L. JACKSON, *and* CAROL BROWER,

    *Defendant-Appellants*,


COLLEGE OF STATEN ISLAND

GOVERNMENT,

*Defendant*,

NIC *and* NPC,

*Amici Curiae*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: LEVAL, CALABRESI, and GIBSON,[*] *Circuit Judges*.

Defendants appeal from the district court's grant of a preliminary injunction prohibiting the College of Staten Island from enforcing against a fraternity its policy of restricting official recognition (and related benefits) to groups that do not discriminate as to gender.

Vacated and remanded.

GREGORY F. HAUSER, Wuersch & Gering LLP, New York, NY, *for Plaintiff-Appellees*.

GREGORY SILBERT, Assistant Solicitor General of the State of New York (Andrew M. Cuomo, Attorney General; Barbara D. Underwood, Solicitor General; Michelle Aronowitz, Deputy Solicitor General), New York, NY, *for Defendant-Appellants*.

TIMOTHY M. BURKE, Manley Burke, Cincinnati, OH, *for Amici Curiae*.

LEVAL, *J*.:

This is an appeal by the defendant City University of New York, a public university, from a preliminary injunction imposed by the United States District Court for the Eastern District of New

---

[*] The Honorable John R. Gibson, Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

York (Irizarry, *J.*) barring the university's constituent, the College of Staten Island ("CSI"), from enforcing against the plaintiff fraternity, Chi Iota Colony ("the Fraternity"), a non-discrimination policy, which restricts official recognition of a student group to those that do not discriminate on the basis of gender.

The Fraternity asserted a right of associative freedom under the First Amendment to limit its membership to male students and contended that CSI's withholding of recognition (and the benefits thereof) by reason of the Fraternity's discriminatory membership policy constituted infringement of a constitutionally guaranteed right. According to the district court's analysis, the crucial question was whether the interest claimed by the Fraternity in single-sex membership was recognized by the First Amendment. Upon concluding that the interest was so recognized, the court reasoned that CSI's contrary policy must be judged under a strict scrutiny test, which the policy could not survive.

As explained below, we believe the district court applied the wrong test and, as a result, reached an incorrect conclusion. The mere fact that the associational interest asserted is recognized by the First Amendment does not necessarily mean that a regulation which burdens that interest must satisfy strict scrutiny. In assessing a First Amendment associational-rights claim, a court must balance the associational interest asserted against the conflicting regulatory interest.

In this case, at least upon the record established for purposes of a preliminary injunction, we conclude that the balance of interests favors CSI, and therefore the school is entitled to enforce its non-discriminatory policy against the Fraternity. We therefore reverse the district court's grant of a preliminary injunction.

## Background

*The College*

The College of Staten Island is a public college within the City University of New York system. As of 2004, CSI had about 11,000 undergraduates, 40% of whom were male. CSI is committed to pluralism and diversity. The school's mission statement says that it hopes to instill in its students "a sensitivity to pluralism and diversity," and that it views "[e]fforts to promote diversity and to combat bigotry [as] an inextricable part of [its] educational mission." The school requires all students to fulfill a "Pluralism and Diversity" requirement by taking at least one course on that topic. CSI also has a policy of "provid[ing] services for students without regard to . . . sex."

CSI encourages students to form clubs in order to "support, enrich, extend, and amplify the goals of CSI's educational mission." In order to be officially recognized and to qualify for various benefits, "the purpose and goals of the student organization must exhibit a clear relationship with the educational mission of [CSI] by demonstrating a commitment to one or more" enumerated objectives. The list of enumerated objectives includes general values such as "promotion of service," "spiritual growth and development," and "promotion and development of cultural diversity and awareness."

In order for a student group to gain recognition, it must comply with CSI's non-discrimination policy:

> [M]embership and participation in it must be available to all eligible students of the College. In addition, in order to be recognized, each organization must agree not to discriminate on the basis of . . . gender . . . .

Additional requirements for recognition are that membership be free, that minutes of business

meetings be submitted to the CSI Office of Student Life and the CSI Student Government, and that meetings and events be publicized at least two weeks in advance.

A group that is recognized is entitled to the following benefits and privileges:

- The use of CSI facilities and services
- Eligibility for insurance through the CSI Association
- The right to use the College of Staten Island name in conjunction with the name of your group
- The right to solicit contributions, underwriting and advertising outside the College . . .
- The use of all CSI approved bulletin boards to publicize events[1]
- Inclusion of events in monthly calendars . . . upon approval by the Office of Student Life
- To arrange news coverage for events of public interest through the Office of Student Life
- The opportunity to request a desk, or workspace in the Campus Center, or weekly meeting space in one of the academic buildings
- The opportunity to apply for special funding through the CSI Student Government
- The exclusive use of a centralized mailbox located in Campus Center . . . .

A group which fails to gain recognition is not banned or forbidden to meet or function; it is, however, not accorded the privileges listed above.

*The Fraternity*

Chi Iota Colony is a male, social fraternity, which draws its members primarily from the CSI student body. As of September 2005, the Fraternity had eighteen members who were CSI students and one member who was not. The Fraternity has placed no limit on its size but has never before exceeded twenty members.

The Fraternity identifies itself as a Jewish organization devoted to "the inculcation of the

---

[1] CSI says that it also permits non-recognized student groups to use its bulletin boards.

traditional values of men's college social fraternities . . . , community service, and the expression of Jewish culture." Its charter states that the group aims "[t]o foster and promote brotherly love, to inaugurate a spirit of cooperation and helpfulness, . . . [and] to encourage vigorous participation in university, college and general activities in [the] community . . . ." Though most Fraternity members are non-practicing Jews, the group welcomes non-Jewish members, and several current members are not Jewish.

The Fraternity does not admit women. According to its president, "The selective, single-sex, all-male nature of the Fraternity is essential to achieving and maintaining the congeniality, cohesion and stability that enable it to function as a surrogate family and to meet [the] social, emotional and cultural needs of its members." He explained that admitting women might lead to romantic relationships between members, causing "inevitable jealousies and other conflicts." Even admitting lesbians might disrupt the special bonds between Fraternity members, because "[h]aving a female in the fraternity is an issue itself."

The Fraternity selects its members through a process called "rush." Fraternity members invite less than ten percent of the men they meet on CSI's campus to rush events. However, invitations are given to about a third of CSI students who have become familiar with Fraternity members through participation in Jewish groups such as Hillel or the Jewish Awareness Movement ("JAM"). Rush events range from meetings at the home of a Fraternity member to social nights at a local pool hall or café. During the February 2003 rush, Fraternity-planned events included "la[s]er tag," "strip club," "kar[a]oke," and "party" – all of which required prospective and current Fraternity members to come into contact with non-members. The rush process, which lasts about two weeks,

is intended to ensure that offers of membership are extended "only [to] those who themselves and [the Fraternity] feel are compatible with the current members."

Most (but not all) of those who attend a first rush event are invited to return for further events. Every prospective member goes through an interview regarding "the reason for and nature of his interest in the Fraternity, his family and other personal aspects of his life, his academic and career plans, [and] his religion and his attitudes about religion." Decisions about whom to invite to join the Fraternity are made by a five-member executive board in consultation with the group's members. No offer is ever made if more than one member is seriously opposed. Of those who repeatedly attend rush events, the majority are asked to "pledge" the Fraternity. Not everyone accepts the offer; somewhere between six and ten students pledge each semester. The Fraternity's president says that it hopes one day to have about fifty pledges, but he doubts that membership will ever exceed fifty, "because CSI is a heavily commuter campus."

The pledge process encompasses the "period of transition between (a) the acceptance of an invitation to membership . . . and (b) the conferral of full membership." Pledging occurs twice per year and lasts five weeks. During this time, transitional members (known as "pledges") get to know one another and the Fraternity's members through weekly meetings with a "pledge master," who teaches about the history of the fraternity, the Greek alphabet, and "what it means to be a [Fraternity] brother." Neither the rushing nor pledging processes include hazing.

Not all pledges become Fraternity members. A pledge can be blocked from joining if the pledge master so decides, or if any other member objects and obtains the pledge master's agreement. Of the six to ten pledges each semester, "most but not all, perhaps five to six" are initiated as

members of the Fraternity. Initiation takes place in a private ceremony, usually at the house of one of the current members. The ceremony is secret and ritualized, and the Fraternity's president described it as "very special." Once a pledge joins the Fraternity, membership is for life unless the member is expelled for disciplinary reasons.

Fraternity members participate in a variety of activities, some of which are open to the public and some of which are not. Meetings at which outsiders are forbidden include:

> meetings at which [the Fraternity] discusses whether to offer membership to a man; meetings at which the ceremony commencing pledgeship is performed; meetings at which the ceremony initiating a man into full membership is performed; meetings at which it considers terminating a man's membership; and . . . certain other business meetings.

Business meetings occur weekly, and less-formal gatherings of members happen at least once a week.

However, many of the Fraternity's activities involve non-members. It participates in weekly meetings arranged by JAM with a rabbi. The meetings, which are frequented by about half of the Fraternity's membership, are open to any student who wishes to attend. The Fraternity also participates "in other JAM activities, including building a sukkah for the Jewish celebration of Sukkot." The Fraternity uses the contacts that its members make at JAM meetings to recruit new members. The Fraternity also holds parties and social events once or twice a month that are open to non-members. The Fraternity advertises for these events, charges for admission, and often turns a profit on them. Women are not only allowed to attend these events but are actively encouraged to do so.

The Fraternity is seeking to become a chapter of Alpha Epsilon Fraternity, Inc. ("AEPi"), an

international umbrella organization for Jewish fraternities. According to its membership manual, AEPi's "basic purpose is to provide the opportunity for a Jewish man to be able to join with other men into a Jewish organization whose purpose is not specifically religious, but rather social and cultural in nature." AEPi proclaims that while it is a Jewish organization, it is "non-discriminatory and open to all who are willing to espouse its purpose and values." AEPi encourages its local chapters to recruit aggressively – "to sell yourself and the fraternity" – and the membership manual advises chapters on how to get "the jump on [their] competitors." However, AEPi's constitution limits membership to men, and the Fraternity's president specified that "[i]f the Fraternity is to maintain its affiliation with, and eventually meet its goal of becoming a chapter of, AEPi, it may have as members only male students."

*The Fraternity's Application*

On or about March 3, 2004, the Fraternity applied to become a chartered and officially recognized CSI student group. On March 29, Carol Brower, CSI's Director of the Office of Student Life, denied the Fraternity's application. One reason given was the group's failure to comply with CSI's non-discrimination policy:

> Membership in a chartered club must be open to all students. Because your constitution appears to exclude females, it contravenes the College's non-discrimination policy. . . .

While the Fraternity has continued to exist despite its inability to obtain official recognition, it claims that its "existence has been and continues to be made much more difficult." The Fraternity has been forbidden to set up recruitment tables at student orientations, to receive funding from CSI, to hand out fliers or advertise on campus, or to appear in a published list of student organizations.

Some students who have been approached about joining the Fraternity have declined to explore membership because of the Fraternity's need to hold its events off-campus. Even some existing members have ceased participating in Fraternity activities because of transportation difficulties. Only when the Fraternity is participating in an event sponsored by a recognized student group can it meet on campus.

*The Lawsuit*

On June 17, 2005, the Fraternity and its eighteen CSI-student members (collectively, "the Fraternity") filed suit in the United States District Court for the Eastern District of New York, alleging that CSI was violating their rights under the First and Fourteenth Amendments, under federal anti-discrimination law, and under New York state law. An amended complaint, filed August 17, named the City University of New York and three of its administrators as defendants. The Fraternity sought damages, as well as an injunction forcing CSI to recognize the Fraternity as an official student group.

On November 22, 2005, the Fraternity moved for a preliminary injunction requiring CSI to recognize the Fraternity as a CSI student organization and forbidding the enforcement against the Fraternity of CSI's student-organization policies. Of particular concern at this stage of the litigation, the Fraternity sought to enjoin CSI from refusing to extend recognition and its benefits unless the Fraternity admitted women.

Defendants moved to dismiss all of the Fraternity's claims. On December 22, 2005, the district court (Irizarry, *J.*) granted the motion as to the Fraternity's state-law claims, finding that the court lacked subject-matter jurisdiction over those claims. That ruling is not part of this appeal.

On August 11, 2006, the district court ruled on the Fraternity's motion for a preliminary injunction and defendants' motion to dismiss the remaining federal-law claims. Based on the Fraternity's size, purpose, recruiting practices, and attitude towards non-members, the court found a "substantial likelihood" that the Fraternity qualified as an intimate association and that being forced to admit women would burden its associational rights. It assumed that "[i]ntrusion on [the] group's freedom of association [wa]s subject to strict scrutiny." The court rejected the defendants' contention that its policy was narrowly tailored to serve a compelling state interest. Accordingly, the court granted a preliminary injunction against the enforcement of CSI's policy.

The defendants appealed the district court's grant of a preliminary injunction. On June 15, 2007, we heard argument, and on June 20 we issued an order vacating the preliminary injunction. This opinion explains our ruling.

**Discussion**

The right to intimate association protects the close ties between individuals from inappropriate interference by the power of the state. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984). To determine whether a governmental rule unconstitutionally infringes on an associational freedom, courts balance the strength of the associational interest in resisting governmental interference with the state's justification for the interference. This will require an assessment of: (1) the strength of the associational interests asserted and their importance to the plaintiff; (2) the degree to which the rule interferes with those interests; (3) the public interests or policies served by the rule imposed; and (4) the tailoring of the rule to effectuate those interests or policies. The more

important the associational interest asserted, and the more the challenged governmental rule burdens the associational freedom, the more persuasive must be the state's reasons for the intrusion, and the more precisely tailored the state's policy must be.

Where a policy interferes with core associational liberties, "it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978). For instance, where a governmental regulation substantially interferes with close familial relationships, the most exigent level of inquiry – strict scrutiny – is applied. *See id.* at 383 ("Since our past decisions make clear that the right to marry is of fundamental importance, and since the classification at issue here significantly interferes with the exercise of that right, we believe that 'critical examination' of the state interests advanced in support of the classification is required."); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 686 (1977) ("[W]here a decision as fundamental as that whether to bear or beget a child is involved, regulations imposing a burden on it may be justified only by compelling state interests, and must be narrowly drawn to express only those interests."); *see also Moore v. City of E. Cleveland*, 431 U.S. 494, 500 (1977) (striking down an ordinance that restricted the ability of family members to live together because, while the ordinance addressed "legitimate goals," it "serve[d] them marginally, at best"). By contrast, where the associational interest claimed by the plaintiff is of less importance, and where the regulation challenged interferes only minimally with the associational freedom, the state's justification for the regulation need not be as weighty. *See Zablocki*, 434 U.S. at 386 ("[R]easonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed."); *see also Lyng v. Castillo*, 477 U.S. 635, 638-39 (1986)

-12-

(upholding a regulation limiting the definition of "household" to exclude certain family members for the purposes of determining food stamp eligibility, because "the statutory classification [did not] directly and substantially interfere with family living arrangements" (quotation marks omitted)).

Rather than balancing CSI's interests in its non-discrimination policy against the Fraternity's interests in opposing the policy, the district court adopted a categorical approach:  Either the policy affected a constitutionally protected liberty or it did not.  The court reasoned that, if CSI's policy affected a constitutionally protected interest, the "[i]ntrusion on [the] group's freedom of association [wa]s subject to strict scrutiny."  In other words, the district court made no distinction between association claims that are strongly protected by the First Amendment and those that are weakly protected; as long as *some* First Amendment interest was implicated by the policy, the policy would be subjected to the rigors of strict scrutiny.

This categorical approach is inappropriate for dealing with association-rights cases.  It fails to account for the "broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State."  *Roberts*, 468 U.S. at 620. Associational claims populate all ground from the heart of the First Amendment to its periphery, resisting facile attempts to divide them neatly into two piles. *See id.* ("[A] relationship's objective characteristics [should be used to] locate it on a spectrum from the most intimate to the most attenuated of personal attachments.").  Moreover, governmental regulations may burden associational freedoms substantially, or minimally, or somewhere in between. Thus, the appropriate question in evaluating an associational-interest claim is not – as the district court asked – whether the associational interest claimed receives constitutional protection. Rather, the question is:  Upon

a balancing of all pertinent factors, do the state's interests, and its means of achieving them, justify the state's intrusion on the particular associational freedom?

## I.      Intimate Association

### A.      Strength of the Associational Interest

The right to intimate association "reflects the realization that individuals draw much of their emotional enrichment from close ties with others," ties that allow for the cultivation and transmittal of shared beliefs. *Id.* at 619. The relationships that have been afforded the most vigorous protection include those involved in the "creation and sustenance of a family" – namely marriage, the begetting, raising, and education of children, and cohabitation with relatives. *Id.*; *see, e.g.*, *Zablocki v. Redhail*, 434 U.S. 374 (1978) (marriage); *Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977) (procreation); *Moore v. E. Cleveland*, 431 U.S. 494 (1977) (cohabitation with relatives). The Supreme Court has explained that these relationships "exemplify" what the right to intimate association is meant to protect, and the Court has cautioned that such relationships "suggest some relevant limitations on the relationships that might be entitled to . . . constitutional protection." *Roberts*, 468 U.S. at 619; *see also Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 520 (1990) (describing the family as "society's most intimate association"). However, the Court has declined to restrict the right to intimate association to the family context. Instead of adopting a categorical approach, the Court has instructed that relationships must be "locate[d] . . . on a spectrum from the most intimate to the most attenuated of personal attachments." *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 546 (1987) (quotation marks omitted). Criteria used to measure the strength of an association's interest in intimacy include "size, purpose, selectivity, and whether others are excluded from critical

-14-

aspects of the relationship." *Id.* We examine these particulars in the context of the Fraternity's claim.

Size: The Fraternity currently has nineteen members, eighteen of whom are CSI students and one of whom is not. It aspires to one day have about fifty pledges per semester. But the Fraternity places no limit on membership size. The fact that the membership roll is not larger is due to the fact that CSI is primarily a commuter campus. Thus, the size limitation is the product of circumstances, not a desire to maintain intimacy. These characteristics render the Fraternity similar to other groups whose intimate-association interests were held to be weak. *See, e.g.*, *id.* ("The size of local Rotary Clubs ranges from *fewer than 20* to more than 900." (emphasis added)); *id.* ("There is no upper limit on the membership of any local Rotary Club.").

Selectivity: The Fraternity employs some care in selecting recruits in order to ensure that all its members are compatible. Every prospective member goes through a screening interview that involves personal questions, and decisions about whom to invite are made in consultation with all current members.

However, upon each year's graduation, the Fraternity presumably ceases to associate regularly with a quarter of its members and seeks to replace them with new members. Like the Rotary Clubs in *Duarte*, the Fraternity must "keep a flow of prospects coming to make up for . . . attrition and gradually to enlarge the membership." *Id.* at 546 (quotation marks omitted). The Fraternity thus aggressively recruits new members from the CSI student body. *See Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 442 (3d Cir. 2000) (finding associational interest to be weak where chapter annually recruited new members). Fraternity members invite

approximately one out of ten men they meet on campus – and about a third of the men they know through Jewish groups – to rush events. Most of those who attend a first rush event are invited back for later events, and the majority of those who attend multiple events are asked to pledge. Most, though not all, pledges are initiated as members. These figures indicate that a relatively high percentage of Jewish men at CSI who express an interest in the Fraternity are invited to join. The degree of selectivity displayed by the Fraternity in choosing new members thus compares unfavorably with that employed in creating the strongest of associational interests, as in the cases of marriage or adoption.

Purpose: The Fraternity's purposes are generally inclusive. The Fraternity aims to "foster and promote brotherly love, to inaugurate a spirit of cooperation and helpfulness, . . . [and] to encourage vigorous participation in university, college and general activities in [the] community . . . ." The Fraternity hopes to promote in its members a respect for "the traditional values of men's college social fraternities . . . , community service, and the expression of Jewish culture." These are broad, public-minded goals that do not depend for their promotion on close-knit bonds. *See Duarte*, 481 U.S. at 546-47 (Rotary Club's goal, "an inclusive fellowship for service based on diversity of interest, . . . does not suggest the kind of private or personal relationship to which we have accorded protection under the First Amendment." (quotation marks and citation omitted)).

To be sure, the Fraternity also seeks to foster personal, intimate relationships between its members. According to its president, Fraternity brothers form "deep attachments and commitments" and share "a community of thoughts, experiences, beliefs and distinctly personal aspects of their lives." But the same can be said of nearly any student group in which members become close

friends. As the Supreme Court explained in rejecting a facial challenge to an anti-discrimination law that affected clubs with more than 400 members:

> It may well be that a considerable amount of private or intimate association occurs in such a setting, as is also true in many restaurants and other places of public accommodation, but that fact alone does not afford the entity as a whole any constitutional immunity to practice discrimination when the government has barred it from doing so.

*N.Y. State Club Ass'n, Inc. v. City of N.Y.*, 487 U.S. 1, 12 (1988).

Exclusion of Non-Members: It is true that some Fraternity activities take place only among its members. Decisions about whether to offer or revoke membership occur in private, as do the ceremonies in which prospective members become pledges and pledges become full members. Weekly business meetings and frequent informal gatherings also take place only in the presence of members.

Nonetheless, the Fraternity involves non-members in several crucial aspects of its existence. Many rush events are held in public places such as local cafés or pool halls. During its February 2003 rush, the Fraternity planned several events requiring the interaction of current and prospective members with non-members – a party, as well as outings to a strip club, a karaoke bar, and a laser tag establishment. *See Roberts*, 468 U.S. at 621 ("[M]uch of the activity central to the formation and maintenance of the association involves the participation of strangers to that relationship."). Once they join, many Fraternity members attend public weekly meetings with the JAM and a rabbi. The Fraternity also participates with the JAM in other Jewish-themed events. *See Pi Lambda Phi*, 229 F.3d at 442 (finding associational interest to be weakened by chapter's participation in many public university events). The Fraternity gives parties, sometimes at a profit, at which non-members –

including women – are encouraged to attend. *See N.Y. State Club Ass'n*, 487 U.S. at 12 (regular receipt of payments from non-members is "at least as significant in defining the nonprivate nature of these associations, because of the kind of role that strangers play in their ordinary existence, as is the regular participation of strangers at meetings"). Social events involving non-members occur "perhaps once or twice a month."

Furthermore, the Fraternity seeks affiliation with AEPi, a national organization. Association with AEPi would involve the members to some extent in activities of the national group and would thus dilute the intimacy of the Fraternity. The Fraternity opposes admitting women at least in part because admitting them would make the Fraternity ineligible for this affiliation. The Fraternity's desire to associate itself with this national organization is in some tension with the purpose of the right to intimate association.

The associational interests of the Fraternity differ from the interests asserted by the social groups that were plaintiffs in *Louisiana Debating and Literary Association v. City of New Orleans*, 42 F.3d 1483 (5th Cir. 1995), on which the district court relied. In that case, the Fifth Circuit considered a New Orleans ordinance, which prohibited discrimination in places of public accommodation. The court found that when applied to certain social clubs, the ordinance violated the club members' right to intimate association. The court found a high degree of exclusive intimacy in the plaintiff clubs. The court noted that the clubs employed a "very restrictive" admissions process in which only existing members could propose a new member. Each club had its own unmarked, private facility, which non-members were strictly prohibited from using. Even the bringing of guests to the clubs was severely limited: The clubs "prohibit[ed] . . . members from

bringing or inviting any male guests, at any time and under any circumstances. Female guests [we]re permitted rarely, but usually, they [we]re the members' wives." *Id.* at 1496. The clubs had between 325 and 600 members, and each club placed a firm limit on the total number of members. The clubs' purpose was purely social, and any discussion of business was prohibited. In light of these factors, the Fifth Circuit concluded that the clubs were intimate associations entitled to a high degree of protection. *Id.* at 1495-98.

Assuming without deciding that we would endorse the decision of *Louisiana Debating*, the Fraternity is distinguishable from the social clubs in that case. Though the Fraternity is smaller, it recruits more widely and aggressively, and it has no limit on total membership. Whereas the *Louisiana Debating* social clubs made no attempt to interact with the outside world – going so far as to keep their facilities unmarked, and substantially barring admission to non-members – the Fraternity regularly incorporates non-members into its activities, including the crucial rush process. Moreover, the Fraternity seeks official recognition from CSI and seeks to affiliate with AEPi. The clubs in *Louisiana Debating* shunned publicity, while the Fraternity makes its presence on campus visible and advertises its parties, from which it financially benefits. Based on its size, level of selectivity, purpose, and inclusion of non-members, the Fraternity lacks the characteristics that typify groups with strong claims to intimate association.

### B. The Degree of State Interference

Also important is the fact that CSI's non-discrimination policy interferes only to a limited extent with the Fraternity's associational rights. CSI's policy does not prevent the Fraternity from continuing to exist, to hold intimate meetings, to exclude women, or to exercise selectivity in

choosing new members. Denial of recognition has consequences primarily for the Fraternity's non-intimate aspects. CSI's denial of use of school facilities interferes more with the Fraternity's ability to solicit strangers from future classes to become new members than it interferes with the ability of its existing members to gather and share intimate associations. The Fraternity has not shown that the unavailability of school facilities makes it impossible, or even difficult, to find suitable places for meetings. CSI's refusal to subsidize the Fraternity's activities does not constitute a substantial imposition on the group's associational freedom. *See Lyng v. Int'l Union, United Auto., Aerospace and Agr. Implement Workers of Am., UAW*, 485 U.S. 360, 368 (1988) (upholding the government's refusal to extend food stamp benefits to workers who strike, because "the strikers' right of association does not require the Government to furnish funds to maximize the exercise of that right"); *Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (upholding law lowering food stamp allotments for certain family members living together below levels they would have received if they had lived separately or been unrelated, because the law does not "'directly and substantially' interfere with family living arrangements and thereby burden a fundamental right"); *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 546 (1983) ("We again reject the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." (quotation marks omitted)).

## C. The State's Interest

CSI's interests in applying its non-discrimination policy are substantial. As the district court acknowledged, "[t]here is undoubtedly a compelling interest in eradicating discrimination based on gender." *See Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987)

("[P]ublic accommodations laws 'plainly serv[e] compelling state interests of the highest order.'" (quoting *Roberts*, 468 U.S. at 624) (second alteration in original)). The school's mission statement declares that "[e]fforts to promote diversity and to combat bigotry . . . are an inextricable part of the educational mission of the University." CSI encourages students to form clubs in order to support the school's goals. To gain recognition, a club must "exhibit a clear relationship with the educational mission" of CSI. By denying recognition to student groups that reject members based on gender, CSI's anti-discrimination policy directly promotes the significant, consistent commitment the school has made to oppose discrimination.

Though recognizing the importance of eradicating discrimination, the district court minimized the state interest in doing so in the present context. The court noted that fraternities and sororities have long existed as single-sex institutions, and that federal anti-discrimination laws specifically exempt fraternities and sororities from their reach. It attached considerable importance to the fact that there "is no law deeming single-sex organizations per se unconstitutional or against national policy." The district court concluded that while eliminating sex discrimination *in general* is a compelling state interest, preventing fraternities from discriminating is not.

The fact that a practice is lawful does not mean that a state may not have a substantial interest in opposing it. An interest need not be protected by federal statutes before it can be considered compelling. In *Roberts*, for instance, the Supreme Court found that Minnesota's public accommodations law served a compelling interest – eradicating discrimination in private clubs – even though the law went further than federal anti-discrimination laws. 468 U.S. at 623; *see also Grutter v. Bollinger*, 539 U.S. 306, 327-33 (2003) (recognizing that states have a compelling interest

in promoting a diverse student body at public universities, even though no federal law requires affirmative action in education). The state's interest in prohibiting sex discrimination is no less compelling because federal anti-discrimination statutes exempt fraternities.

Moreover, CSI has a substantial interest in making sure that its resources are available to all its students. When a student group is officially recognized by CSI, it becomes entitled to a range of benefits, including use of CSI facilities and services, eligibility for insurance through the school, the right to use the CSI name in conjunction with the group, and the opportunity to apply for funding from the student government. These benefits are funded in part by tuition paid by CSI's students; CSI's non-discrimination policy ensures that all its students have access to the organizations that enjoy these benefits. *See Roberts*, 468 U.S. at 624 (state has a compelling interest in "assuring its citizens equal access to publicly available goods and services").

**D. The Tailoring of the Policy**

The Fraternity does not dispute that CSI's policy is well tailored to achieve the state's interests. The policy embodies CSI's commitment to eradicating discrimination, and it directly promotes the school's goal of ensuring that all its students have equal access to its resources. The Fraternity does not suggest any less-intrusive way that the school might accomplish these goals.

\* \* \*

In sum, the Fraternity's interests in intimate association[2] are relatively weak; CSI's non-

_____

[2] The plaintiffs based their suit not only on their interest in intimate association but also on their interest in expressive association. The district court denied relief on that ground, and plaintiffs did not appeal. They now argue that, even if we reverse the grant of the preliminary injunction because of flaws in the intimate-association interest theory, we should nonetheless affirm the preliminary injunction if it was justified by expressive-association interests. Because plaintiffs did

discrimination policy imposes no great burden on the plaintiffs' enjoyment of those interests; the policy serves several important state interests; and the policy is well tailored to effectuate those interests. Given this balance of the pertinent factors, we believe the district court erred in granting a preliminary injunction barring CSI from enforcing its policy of denial of recognition to a group that categorically excludes members on the basis of gender.[3]

## Conclusion

The preliminary injunction is vacated and the case is remanded for further proceedings.

---

not appeal from the court's denial of relief on that ground, we will not consider it at this time. Plaintiffs of course remain free on seeking final judgment to advance the expressive-association ground, notwithstanding their loss at the preliminary injunction phase.

[3] The district court preliminarily enjoined CSI from enforcing its policy against rushing and pledging, as well as its anti-discrimination policy. In the district court's reasoning, both facets of the injunction rested on the same erroneous ground: the court's conclusion that CSI had violated the Fraternity's right to intimate association. We express no view whether, under other reasoning, an injunction barring enforcement of the prohibition against "rushing" and "pledging" might be sustained.